Simion STEPANISCHEN, Plaintiff,
Appellant,

v.

MERCHANTS DESPATCH TRANSPOR-
TATION CORPORATION,
Defendant, Appellee.

No. 83–1355.

United States Court of Appeals,
First Circuit.

Argued Sept. 8, 1983.

Decided Dec. 6, 1983.

James F. Freeley, Jr., Boston, Mass., with whom John E. Sheehy, Boston, Mass., was on brief, for plaintiff, appellant.

Melvin A. Schwarz, Washington, D.C., with whom Dechert, Price & Rhoads, Washington, D.C., Martha Coakley, and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for defendant, appellee.

Before COFFIN, Circuit Judge, FAIRCHILD *, Senior Circuit Judge, and BREYER, Circuit Judge.

COFFIN, Circuit Judge.

Simion Stepanischen appeals from a district court award of summary judgment to defendant Merchants Despatch Transportation Corporation (MDT). Following his discharge by MDT, Stepanischen brought claims for: (1) illegal discharge for union-organizing activities under the Railway Labor Act (RLA) Section 2 Fourth, 45 U.S.C. § 152 Fourth; (2) bad faith termination of an employee at will; and (3) defamation.

On September 1, 1976, Stepanischen commenced work as an assistant inspector, working the midnight to 8:00 a.m. shift at MDT's office in Everett, Massachusetts. MDT is a wholly owned subsidiary of Conrail. MDT employees inspected railroad refrigeration cars at rail yards in Everett and Chelsea, Massachusetts. MDT performed similar operations at the rail yard in Selkirk, New York. MDT was responsible for inspection of railroad refrigeration cars once every twenty-four hours. At all times relevant to this suit, the MDT inspectors employed at both the Everett-Chelsea and Selkirk yards were non-unionized.

During his first two years at MDT, Stepanischen received commendations for his work performance and concomitant increases in pay. Near the end of his second year at work for MDT, Stepanischen's work habits apparently came under critical scrutiny. In July 1978, Ralph Schmidt, a Conrail supervisor, notified Ray Allen, Stepanischen's immediate supervisor, that Schmidt could not locate Stepanischen at the rail yard at the start of Stepanischen's shift. Schmidt

* Of the Seventh Circuit, sitting by designation.

informed Allen that Schmidt would recommend termination of Stepanischen if he continued to be unaccountable during working hours.

In the summer of 1978, Stepanischen decided to seek the unionization of MDT inspectors at the Everett-Chelsea and Selkirk yards. On September 9, 1978, certain MDT employees attended a union organizing meeting in Selkirk. Stepanischen was in Selkirk that day along with MDT's Vice President, Frank Underwood, and District Manager, Fred Langrehr.

On October 10, 1978, MDT re-evaluated Stepanischen's work performance and denied him a merit increase in salary. In the succeeding months, Allen allegedly encountered repeated deficiencies in the thoroughness and timeliness of Stepanischen's work habits. On February 16, 1979, however, Allen observed marked improvement and wrote a letter to his supervisor, J.A. Rizzo, notifying him of this progress.

On June 11, 1979, Allen entered the Everett-Chelsea yard at about 1 a.m. with the intent of accompanying Stepanischen during his inspections. Allen alleged that soon after his arrival at the Everett-Chelsea yard, he found inside Stepanischen's truck a set of falsified inspection cards. Allen stated that at 1:20 a.m. the cards indicated inspection times ranging from 12:30 to 2:30 a.m. Allen could not find Stepanischen until approximately 3:50 a.m. He asked Stepanischen where he had been, and Stepanischen replied that he had been at breakfast.

Allen reported this incident to Rizzo who, later on June 11, suspended Stepanischen without pay, based on charges of falsifications of records and theft of company time. Stepanischen denied the accusations. On June 12, Allen drafted a memorandum outlining the June 11 incident. On June 22, MDT held a hearing to give Stepanischen an opportunity to rebut the charges. Stepanischen offered the names of three witnesses who would testify to his whereabouts during the first half of his June 11 shift. None of the witnesses rendered what MDT officials considered to be a satisfactory explanation of Stepanischen's location during his shift. MDT permanently terminated Stepanischen on June 25, 1979.

Stepanischen filed this action on August 7, 1981. On April 13, 1983, the court granted MDT's motion for summary judgment on all counts of the complaint.

I. RLA Section 2 Fourth

A. *Private Right of Action*

Appellee MDT challenges that part of the district court's order which found that plaintiff could maintain a private right of action under Section 2 Fourth of the Railway Labor Act. We note initially that every appellate court and every district court but one that has addressed the issue has found that a implied private right of action exists under Section 2 Fourth. *See International Association of Machinists & Aerospace Workers v. Northwest Airlines,* 673 F.2d 700, 707 (3d Cir.1982); *United States v. Winston,* 558 F.2d 105, 108 & n. 3 (2d Cir.1977) (noting paucity of criminal proceedings under § 2 and active pursuit of civil relief thereunder); *Adams v. Federal Express Corp.,* 547 F.2d 319, 321 (6th Cir. 1976), *cert. denied,* 431 U.S. 915, 97 S.Ct. 2177, 53 L.Ed.2d 225 (1977); *Conrad v. Delta Air Lines, Inc.,* 494 F.2d 914, 918 (7th Cir.1974); *Brady v. Trans World Airlines, Inc.,* 401 F.2d 87, 95–96 (3d Cir.1968), *cert. denied,* 393 U.S. 1048, 89 S.Ct. 680, 21 L.Ed.2d 691 (1969); *Scott v. American Airlines, Inc.,* 488 F.Supp. 415, 419–20 (E.D.N.Y.1980); *International Association of Machinists & Aerospace Workers v. Altair Airlines, Inc.,* 481 F.Supp. 1359, 1360 (E.D.Pa. 1979); *Kent v. Fugere,* 438 F.Supp. 560, 563–65 (D.Conn.1977); *Lum v. China Airlines Co.,* 413 F.Supp. 613, 614–16 (D.Hawaii 1976) (distinguishing the sole case, *International Association of Machinists & Aerospace Workers v. Air Indies Corp.,* 86 L.R. R.M. 2076 (D.P.R.1973), that has held to the contrary); *Griffin v. Piedmont Aviation, Inc.,* 384 F.Supp. 1070, 1072 (N.D.Ga.1974).

Despite these cases, MDT contends that the district court erred in finding an implied private right of action, because Congress intended the substantive provisions of Section 2 Fourth to be enforceable only in

criminal actions brought by the Attorney General under Section 2 Tenth. MDT argues that the district court (as well as many of the courts listed above) incorrectly relied on *Burke v. Compania Mexicana de Aviacion, S.A.*, 433 F.2d 1031 (9th Cir.1970), which had found that an implied private right of action existed under Section 2 Fourth. The Ninth Circuit decided *Burke* before *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), in which the Supreme Court set out a four-step analysis for deciding whether to infer a private right of action under a federal statute. MDT asserts that *Cort v. Ash* and its progeny have explicitly rejected the reasoning in *Burke.*

MDT also claims that the Ninth Circuit itself has disavowed *Burke.* In *Le Vick v. Skaggs Companies,* 701 F.2d 777 (9th Cir. 1983), the Ninth Circuit overruled its decision in *Stewart v. Travelers Corp.,* 503 F.2d 108 (9th Cir.1974), in which the court had implied a cause of action under 15 U.S.C. § 1674(a) for wrongful discharge resulting from garnishment of an employee's wages. *See also McCabe v. City of Eureka,* 664 F.2d 680 (8th Cir.1981). Both *Le Vick* and *McCabe* disapproved of the proposition advanced in *Stewart* that "[i]n the absence of a clear congressional intent to the contrary, the courts are free to fashion appropriate civil remedies based on the violation of a penal statute where necessary to ensure the full effectiveness of the congressional purpose." *Stewart,* 503 F.2d at 110 (quoting *Burke* ).

MDT's arguments have some merit, but cannot prevail in light of both the legislative history of section 2 Fourth and Tenth

and recent Supreme Court precedent regarding implied private rights of action. Accordingly, while some of the reasoning of *Burke* may no longer be valid, its holding nonetheless remains correct.[1]

Many of the cases listed above relied on *Burke* without undertaking an independent analysis of the propriety of an implied private right of action under RLA Section 2 Fourth. Given that the Supreme Court has, subsequent to *Burke,* altered and refined the standard for determining whether a statute confers an implied right of action, a fresh examination of the issue is in order.

In determining whether the statute in question implies a private right of action, we are guided by the Supreme Court's refinement of the *Cort v. Ash* test in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), in which the Court held that a private right of action may be inferred from § 901(a) of Title IX of the Education Amendments of 1972. The Court employed the *Cort v. Ash* four-factor test, *id.* at 689–709, 99 S.Ct. at 1953–1964, but focused on the ultimate issue of legislative intent, using the *Cort* factors only as indicia of intent.

The threshold question under *Cort* and *Cannon* is whether Congress enacted the statute for the benefit of a special class of which the plaintiff is a member. The language of Section 2 Fourth specifically protects the organizing activities of employees of carriers by railroad, as defined in Section 1 First. 45 U.S.C. § 151 First. Section 2 Fourth states:

"... . No carrier, its officers, or agents shall deny or in any way question the

1. Although we agree with the *Le Vick* and *McCabe* courts that the reasoning of *Burke* is incorrect in permitting courts freely to create civil remedies to further a congressional purpose, we find that *Le Vick* and *McCabe* nonetheless do not disturb the holding of *Burke.* The *Le Vick* and *McCabe* courts addressed 15 U.S.C. § 1674(a), part of the Consumer Credit Protection Act. Both courts noted that every subchapter of that act except the subchapter containing § 1674 expressly provided private civil remedies. The *Le Vick* and *McCabe* courts reasoned that an express private right of action in one section militates against implying

a private right of action in another section of the same piece of legislation. *See Le Vick,* 701 F.2d at 779–80; *McCabe,* 664 F.2d at 682. Since the Railway Labor Act does not contain an express right of action, the canon of construction employed in *Le Vick* and *McCabe* does not apply to the case at bar. Therefore, the Ninth Circuit's reversal in *Le Vick* of the *Stewart* case, which had found an implied private right of action under 15 U.S.C. § 1674(a), does not necessarily alter the result in *Burke,* which had found an implied private right of action under RLA Section 2 Fourth.

right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees . . ."

Similar language in an 1893 statute providing specific protections for a specific class of persons made "irresistible" the Court's earliest inference of a private right of action. *Cannon*, 441 U.S. at 689, 99 S.Ct. at 1953 (citing *Texas & Pacific Railway Co. v. Rigsby*, 241 U.S. 33, 40, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916)). The language in that 1893 statute, in Title IX and in RLA Section 2 Fourth expressly identifies a class that Congress intended to benefit, and contrasts sharply with statutory language customarily found in criminal statutes, such as that construed in *Cort v. Ash*, and other laws enacted to protect the general public. *See Cannon*, 441 U.S. at 690 n. 13, 99 S.Ct. at 1954 n. 13.

Under the second *Cort* factor—legislative history—the Congress that enacted Section 2 in 1934 apparently envisioned that Section 2 would be enforceable by private plaintiffs in federal court. Given that Section 2 Fourth specifically granted railroad employees certain rights, " 'it is not necessary to show an intention to *create* a private cause of action, although an explicit purpose to *deny* such cause of action would be controlling.' *Cort*, 422 U.S. at 82, 95 S.Ct. at 2090 (emphasis in original)." *Cannon*, 441 U.S. at 694, 99 S.Ct. at 1956 (footnote omitted). The legislative history of Section 2 Fourth is silent on the issue of a private right of action, but the historical context of Section 2 suggests that Congress most likely assumed that the statute granted a private right of action. Four years before the passage of Section 2 Fourth, the Supreme Court inferred a private right of action under Section 2 Third of the Railway Labor Act, which prohibits employer interference, influence or coercion with respect to employee unionizing activity. *Texas & New Orleans Railroad Co. v. Brotherhood of Railway & Steamship Clerks*, 281 U.S. 548, 569, 50 S.Ct. 427, 433, 74 L.Ed. 1034 (1930). In 1934, Congress amended Section 2 by adding a stronger noninterference provision (Section 2 Fourth) and criminal penalties (Section 2 Tenth). Congress did not explicitly withdraw the private right of action against employer hindrance of employee organizing activity that the Supreme Court had recently recognized. If Congress had intended the criminal sanctions of Section 2 Tenth to be the exclusive means for enforcing Section 2 Fourth, Congress would probably have so specified in light of then-recent Supreme Court precedent. That Congress added emphasis to its protection of organizing activity without specifically ruling out private enforcement of those substantive rights suggests that Congress ratified extant judicial construction of the Act.

Last term, the Supreme Court faced a similar issue of statutory construction. In *Herman & MacLean v. Huddleston*, —— U.S. ——, ——, 103 S.Ct. 683, 689, 74 L.Ed.2d 548 (1983), a unanimous Court permitted an implied right of action under § 10(b) of the Securities Exchange Act of 1934 for misrepresentations in a registration statement, notwithstanding the express remedy for misstatements and omissions in registration statements provided by § 11 of the Securities Act of 1933. The Court noted that when Congress comprehensively revised the securities laws in 1975, federal courts had consistently recognized a private right of action under § 10(b) regardless of the availability of other express remedies. "In light of this well-established judicial interpretation, Congress' decision to leave Section 10(b) intact suggests that Congress ratified the cumulative nature of the Section 10(b) action." *Huddleston*, —— U.S. at ——, 103 S.Ct. at 689; *cf. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 381–82, 102 S.Ct. 1825, 1840, 72 L.Ed.2d 182 (1982) (private right of action recognized where comprehensive amendment of enforcement mechanisms of Commodity Exchange Act left intact provisions under which federal courts had implied a cause of action).

MDT argues that the enactment of express criminal penalties enforceable solely by the Attorney General indicates congressional intent to preclude enforcement by

private parties in implied civil actions. *See Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 246–47, 62 L.Ed.2d 146 (1979) ("it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it"). The Court stated in the same year as *Transamerica,* however, that the provision of express remedies in one portion of a complex statutory scheme does not provide sufficient reason for refusing to imply an otherwise appropriate remedy under a separate section. *See Cannon,* 441 U.S. at 711, 99 S.Ct. at 1965; *see also Cort v. Ash,* 422 U.S. at 82–83 n. 14, 95 S.Ct. at 2090 n. 14. Thus, in *Cannon,* the express penalty of termination of federal funds to any institution that violated the substantive protections of Title IX did not preclude an implied private cause of action. And last term in *Huddleston,* the existence of an express remedy under § 11 of the Securities Act of 1933 did not preclude the Court from continuing to infer a private right of action under § 10(b) of the Securities Exchange Act of 1934. The Court explicitly rejected the maxim of statutory construction that the express provision of one remedy mandates the exclusion of all others. —— U.S. at —— n. 23, 103 S.Ct. at 690 n. 23.

Application of the third and fourth *Cort* factors also indicates the Congress meant to imply a right of action under Section 2 Fourth. Implying a right of action for employees who allege that they have been discharged for organizing activity is not only consistent with the underlying purposes of the Railway Labor Act, it appears in practice to have been the primary mechanism for implementing the goals of the Act. *See Winston,* 558 F.2d at 108 n. 3. Moreover, we doubt that Congress intended to confine the remedy of a Section 2 Fourth violation to imprisoning employers, without providing illegally discharged employees with reinstatement and back pay.

The fourth inquiry under *Cort* is whether implying a federal remedy would intrude upon subject matter traditionally relegated to state law. Congress has, pursuant to its commerce power, made the area of railway labor relations an important topic of federal concern. Congress intended an industry-wide, and therefore nationwide, scheme for avoiding any interruptions to commerce caused by labor disputes between rail carriers and their employees. *See California v. Taylor,* 353 U.S. 553, 565–66, 77 S.Ct. 1037, 1044–45, 1 L.Ed.2d 1034 (1957). Nearly a century of evolving congressional regulation of railway labor relations, *see id.* at 557, 77 S.Ct. at 1040, refutes any claim that this is an area traditionally left to state law.

Our examination of the legislative intent of Section 2 Fourth of the Railway Labor Act, as illuminated by the four *Cort* factors, leads us to affirm the district court's holding that Congress intended the Act to provide non-union railway employees, such as Stepanischen, with a cause of action against an employer that discharged an employee for organizing activities. We must now decide whether the district court properly granted summary judgment against Stepanischen on his claim under RLA Section 2 Fourth.

### B. *Summary Judgment*

■ We note with frustration the more and more typical phenomenon, present in this case, of a district court having to decide a motion for summary judgment without the assistance the court should expect from counsel. Stepanischen's counsel filed barely adequate summary judgment papers in district court, then suddenly revived to give this court a factually detailed, 49-page brief on appeal. The district court explicitly noted the stark quantitative and qualitative differences between the parties' summary judgment papers. In support of its motion for summary judgment, MDT filed a 27-page memorandum of law and a lengthy appendix containing affidavits from two MDT officials and excerpts of relevant deposition testimony. Stepanischen, by contrast, filed only a one-page "objection" to MDT's motion for summary judgment, a one-page cross-motion for summary judgment, and a two-page affidavit from Stepanischen. Stepanischen also expressly re-

lied on a 10-page pretrial memorandum of law that he had already filed.

The district court reviewed Stepanischen's circumstantial evidence of MDT's anti-union animus, including (1) MDT's denial of a pay raise to Stepanischen soon after the September 9, 1978, union organizing meeting in Selkirk, New York, (2) the severe reduction in overtime and constant supervision of his work after the Selkirk meeting, and (3) the allegedly false charges against him arising out of the June 11 incident that led to his termination. The court then stated: "Whatever reasonable inference of anti-union retaliation which could be drawn from this series of events has been negated completely by the uncontroverted facts proffered by the defendant." The court considered the "most damaging evidence" against Stepanischen to be "the unrebutted statements of key MDT officers under oath" that anti-union animus played no part in the decision to discharge Stepanischen. In the face of "unopposed facts" presented by defendant MDT, the court found that "the plaintiff's circumstantial evidence is so attenuated that, as it stands, it leads to nothing more than conjecture". The court also stated that Stepanischen's affidavit fell far short of establishing a genuine issue of material fact concerning anti-union bias.

We have looked through the record in this case, including the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits". Fed.R.Civ.P. 56(c). Having done so, we feel compelled to conclude that they show a "genuine issue" of "material fact". The basic issue in the case is the state of mind of the employer: did it in fact discharge Stepanischen for an antiunion reason?

The employer filed affidavits from some of the relevant personnel denying any such motive, accompanying these denials with considerable supporting information, particularly excerpts from Allen's deposition in which he described his inability to locate Stepanischen at the job site on June 11, 1979, and his discovery of falsified inspection forms in Stepanischen's truck early that morning. Yet Stepanischen states in his deposition that on June 11 he was present on the job and had the inspection forms in his pocket at the time Allen claims to have discovered them in the truck. A jury, hearing both testify, could conceivably believe that Allen had fabricated, or exaggerated, his side of the story. The depositions also offer evidence of several conversations between Stepanischen and various MDT officials that might be construed to indicate an antiunion animus. Similar inferences concerning the employer's motivations might be built from the various ways in which Stepanischen claims he was unfavorably treated by the company after his union-organizing efforts. We believe that a jury, taking these allegations together and choosing to credit Stepanischen's account and to discredit the employer's, could reasonably conclude that Stepanischen was dismissed because of an antiunion motive. Where such a conclusion is possible, a genuine issue of material fact would of course persist.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, the court must look at the record in the light most favorable to the party opposing the motion and must indulge all inferences favorable to that party. *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976).

In cases where, as here, the state of mind of one of the parties is crucial to the outcome of the case, resort to summary judgment is vested with more than the usual difficulty. Under such circumstances, jury judgments about credibility are typically thought to be of special importance. Thus courts are particularly cautious about granting summary judgment in such cases. *See, e.g., Gual Morales v. Hernandez Vega,* 579 F.2d 677, 680–81 (1st Cir.1978) (quoting *Hahn v. Sargent,* 523 F.2d at 468); *Conrad*

*v. Delta Air Lines, Inc.,* 494 F.2d 914, 918 (7th Cir.1974) (questions of employer's anti-union bias in action brought under RLA Section 2 Fourth precluded summary judgment for defendant airline). But the presence of issues involving state of mind, intent, or motivation does not automatically preclude summary judgment. " '[A] party against whom summary judgment is sought is [not] entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element. There must be some indication that he can produce the requisite quantum of evidence to enable him to reach the jury with his claim.' " *White v. Hearst Corp.,* 669 F.2d 14, 17 (1st Cir.1982) (quoting *Hahn v. Sargent,* 523 F.2d at 468); *see, e.g., Packish v. McMurtrie,* 697 F.2d 23, 27 (1st Cir.1983); *Manego v. Cape Cod Five Cents Savings Bank,* 692 F.2d 174, 177 (1st Cir.1982).

In a discriminatory discharge case, it is likely that a plaintiff could seldom uncover direct proof that his employer fired him solely for union organizing activity. Particularly those management officials who would be inclined to discharge employees interested in a union have become sufficiently sensitive to the legal impediments to such a strategy. Thus, a plaintiff in a case like this will rarely, if ever, be able to produce a "smoking gun" that provides direct, subjective evidence of an employer's anti-union intent. Rather, a plaintiff must try to convince the fact-finder to draw an inference from a broad array of circumstantial and often conflicting evidence regarding the employer's general anti-union attitude, the extent of the employee's involvement in union-organizing activity and the employer's knowledge thereof, and the credibility of the reasons advanced for the employee's discharge. At the summary judgment stage of litigation, a court should ask itself whether the plaintiff could prevail if a jury or judge believed plaintiff's version of the facts and disbelieved defendant's version.

█ MDT first argues that since Stepanischen adopted *in toto* the very depositions upon which MDT relied in successfully moving for summary judgment, Stepanischen thereby acknowledged the truth of every fact cited by MDT. Such an interpretation would have Stepanischen conceding away his case. It cannot be true that plaintiff's reliance upon depositions for the purposes of summary judgment necessarily implies that plaintiff accepts all of the arguments that defendant has based on those depositions. The parties to this case have obviously drawn very different inferences from the very same depositions.

MDT argues, second, that once it supported its summary judgment motion with a substantial memorandum, affidavits, and a lengthy appendix of deposition excerpts, the burden shifted to the nonmoving party, Stepanischen, to rebut MDT's showing that no genuine issue of material fact remained in the case. This argument misconceives the interplay of Rules 56(c) and 56(e). Rule 56(e) provides that when a motion for summary judgment has been made and supported, the nonmoving party may not rest upon mere allegations, but his response must set forth specific facts showing that there is a genuine issue for trial. "If he does not so respond, summary judgment, *if appropriate,* shall be entered against him." (Emphasis added.)

> "The phrase 'if appropriate' incorporates the general standard [of Rule 56(c)] which requires the absence of genuine issues of material fact. The drafters of Rule 56(e) made clear in their comments to the rule that '[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, *summary judgment must be denied even if no opposing evidentiary matter is presented.'* This interpretation is also consistent with the principle that the initial and ultimate burden of persuasion in a summary judgment motion rests with the moving party." *Thornton v. Evans,* 692 F.2d 1064, 1075 (7th Cir.1982) (citation omitted).

█ If a movant has alleged particular undisputed facts that entitle it to summary judgment as a matter of law, then the burden shifts to the opposing party to show that summary judgment is inappropriate. *Nicholas Acoustics & Specialty Co. v. H &*

*M Construction Co.,* 695 F.2d 839, 844 (5th Cir.1983). But here MDT never carried its initial burden as the moving party of proving that no genuine issue of material fact existed. The depositions alone contain disputed crucial issues sufficient to require resolution at trial. Where as here, the record makes plain that a genuine issue of material fact is still in dispute, it has often been thought not "appropriate" to grant summary judgment. *See e.g., Donovan v. Agnew,* 712 F.2d 1509, 1515–16 (1st Cir. 1983); *Mack v. Cape Elizabeth School Board,* 553 F.2d 720, 722 (1st Cir.1977); *Bernard v. Gulf Oil Co.,* 596 F.2d 1249, 1255 (5th Cir.1979), *adopted en banc but remanded on other grounds,* 619 F.2d 459 (1980), *aff'd,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

■ Finally, MDT argues that even if genuine issues of material fact lurked somewhere in the record before the district court, plaintiff's failure to cite that evidence to the district court, presumably by affidavits or specific record references, freed the district court from having to probe the record and bars this court from considering such evidence on appeal. Given the kind of situation postulated by the argument, we find the principle attractive. And we accept the teaching that counsel should in general not take the risk of filing barely minimal memoranda and affidavits to guide the court through the record on a motion for summary judgment. It is always prudent for the party opposing summary judgment to offer affidavits establishing the unresolved material disputes or at least to provide the court with memoranda indicating where in the record those disputes are evidenced. It is likewise irresponsible for a party's attorney to neglect to do so in a case where the record is at all sizeable or complex.

But on this record, we cannot agree with MDT's argument that its opposing counsel's

minimal effort at summary judgment altered the Rule 56 standard. Failure of the nonmoving party to match the length and quality of the moving party's papers does not automatically relieve the court of its statutory task of determining whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . ." Fed.R.Civ.P. 56(c). Although the court in a proper case may, as we discuss below, establish ground rules that facilitate the search for an issue of material fact, the rule itself does not limit the court's examination to issues raised in affidavits or to record evidence pinpointed in the parties' memoranda. *See Yong Hong Keung v. Dulles,* 127 F.Supp. 252, 252 (D.Mass.1954) (Aldrich, J.) (Rule 56(e)'s allowance of affidavits is "an enlarging provision . . . not a restriction"); 10A Wright, Miller & Kane, Federal Practice and Procedure, Civil 2d § 2721, at 44 (1983).

A dispute concerning a material fact is no less genuine if raised in a deposition rather than in an affidavit. Rule 56(c) expressly provides that the district court should consider depositions, among other record items, in deciding whether the moving party has carried its burden of proving that no genuine issue of material fact exists. *See Nicholas Acoustics,* 695 F.2d at 845–46; *Keiser v. Coliseum Properties, Inc.,* 614 F.2d 406, 410 (5th Cir.1980) ("a court can only enter a summary judgment if *everything* in the record—pleadings, depositions, interrogatories, affidavits, etc.—demonstrates that no genuine issue of material fact exists"); *Higgenbotham v. Ochsner Foundation Hospital,* 607 F.2d 653, 656–57 (5th Cir.1979) (Rule 56(c) "does not distinguish between depositions merely filed and those singled out by counsel for special attention") (footnote omitted).[2]

---

**2.** These Fifth Circuit decisions requiring district courts to examine the entire record on a motion for summary judgment have also suggested that, in a large and complex case, a district court simply could not, and therefore need not, read the entire record before deciding a summary judgment motion. *See Nicholas Acous-*

*tics,* 695 F.2d at 846–47 ("Judges are not ferrets!"); *Higgenbotham,* 607 F.2d at 656–57 (deposition creating factual dispute did not force the court to search for "a needle in a paper haystack", because the case involved only five depositions).

In the case at bar, the depositions of Stepanischen and relevant MDT officials indicate widely divergent factual assertions and inferences to be drawn therefrom on several critical issues. Thus, even though the district court found that the affidavits of two MDT officials were "unrebutted" by Stepanischen's conclusory affidavit, which merely "repeat[ed] prior allegations", summary judgment for MDT was nonetheless inappropriate given the conflicting deposition testimony. *Cf. Mack v. Cape Elizabeth School Board,* 553 F.2d at 722. MDT cannot eliminate the central dispute of this case—whether MDT discharged Stepanischen because of his union activity—by relying on sworn statements by MDT officials that anti-union animus did not affect MDT's decision to terminate Stepanischen's employment. In *Conrad v. Delta Air Lines,* 494 F.2d at 918, a similar suit brought under the same statute, RLA Section 2 Fourth, the court held that sworn statements from Delta officials that illicit motivations played no part in Conrad's discharge were insufficient to remove the issue of motivation from that case, in which improper motive could reasonably be inferred from facts before the court.

The case at bar does not present our court with the extreme situation where an obscure statement or exhibit buried deep in a huge record raises a genuine, material factual dispute. The record here is not exceptionally long. The worst part of it is Stepanischen's 600-page deposition, but as we observe below, Stepanischen supplied the court with some simplifying indicators to facilitate the court's examination of his deposition. The remainder of the record is shorter; and the whole can be described as "manageable".

Stepanischen did file an affidavit and other documents that provided some help, albeit not very much, to the district court. In his affidavit he stated, for example, that "on June 11, 1979 . . . I was present at the Boston Market Terminal and New England Produce Center for work during assigned work hours except when I was off for breakfast". He added that the claim of "false entries on June 11, 1979" was a "pretext for the discharge". This document, along with the plaintiff's Memorandum of Law in the district court, which outlined Stepanischen's version of the events leading up to his discharge, might have alerted the district court to a special need to go through the record in this case and could have pointed the court toward plaintiff's deposition, and particularly his account of the events of June 11, as sensible places to start. Even though Stepanischen's counsel was not very helpful, the court nonetheless had some available guideposts to aid its tour through the record. We therefore conclude, contrary to the district court, that genuine issues of material fact exist.

Having reached this conclusion, not without reluctance, the specter of district court judges being unfairly sandbagged by unadvertised factual issues prompts us to address the problem more generally. A district court might deal with the problems of the sprawling record by ordering the party moving for summary judgment to provide a list of undisputed facts, buttressed by appropriate record citations, that would entitle the moving party to summary judgment. The court could then order the opposing party to provide a counter-list of genuine, material factual issues, again with appropriate record citations, that would preclude summary judgment. And once so warned, a party's failure to comply would, where appropriate, be grounds for judgment against that party.

Further, other district courts faced with the recurrent problem of "ferreting through the record" have enacted local rules requiring counsel to offer the court guidance. *See* Note, *Court Examination of the Discovery File on a Motion for Summary Judgment,* 79 Mich.L.Rev. 321, 325 & n. 19 (1980) (listing districts with local rules placing burden on opponent of summary judgment). Judges might consider, for example, adopting a local rule, pursuant to Fed.R.Civ.P. 83, along the lines of Civil Rule 3(g) of the United States District Court for the Southern District of New York, which states:

"Upon any motion for summary judgment pursuant to Rule 56 of the Federal

Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion.

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.

All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

See *SEC v. Research Automation Corp.,* 585 F.2d 31, 34 n. 6 (2d Cir.1978):

"This rule [formerly Local Rule 9(g)], promulgated under the general authority of Fed.R.Civ.P. 83, enables the parties and the court to clear away the fog that so often hangs over the early stages of litigation. By forcing refinement of the issues, it serves a valuable function even if the motion for summary judgment is denied and the case must proceed to trial."

Similar rules have been adopted by at least two district courts in this circuit. *See* District of Puerto Rico Local Rule 8(N); District of Rhode Island Local Rule 12.1. We recommend that the District of Massachusetts consider whether some such rule is desirable.

## II. Bad Faith Termination of an Employee at Will

█ In Count II of his complaint, Stepanischen sought recovery under Massachusetts law protecting at-will employees from bad faith termination of employment. The district court granted summary judgment on this count to MDT, because plaintiff had not presented any proof either that MDT discharged Stepanischen to avoid payment of compensation which would otherwise be due to Stepanischen or that MDT's reason

for the discharge violated public policy. *See Siles v. Travenol Laboratories, Inc.,* 13 Mass.App.Ct. 354, 358, 433 N.E.2d 103 (1982).

A discharge motivated by anti-union animus would violate public policy. The district court relied on its grant of summary judgment to MDT on the Railway Labor Act claim to hold that MDT's actions did not violate public policy. Given our reversal of the district court's award of summary judgment on the Railway Labor Act claim, we accordingly reverse the district court's entry of summary judgment in favor of MDT on Stepanischen's charge of bad faith termination.

## III. Defamation

█ Stepanischen's claim for defamation focuses on two statements by MDT officials. The first allegedly defamatory statement was Ray Allen's June 12 memorandum outlining the events of the preceding day. The second such statement is contained in MDT's responsive pleading to Stepanischen's claim for wrongful discharge filed with the National Railroad Adjustment Board (NRAB).[3] The district court correctly held that MDT's statement filed with the NRAB was absolutely privileged as the writing of an attorney during the course of an adjudicatory proceeding. *See Sriberg v. Raymond,* 544 F.2d 15, 16 (1st Cir.1976); *Sriberg v. Raymond,* 370 Mass. 105, 108–09, 345 N.E.2d 882 (1976); Restatement (Second) of Torts § 586 (1976).

█ The district court found that the first statement (Allen's memorandum) was an internal company memorandum and was therefore conditionally privileged and actionable only upon proof of actual malice. *See Arsenault v. Allegheny Airlines, Inc.,* 485 F.Supp. 1373, 1379–80 (D.Mass.), *aff'd mem.,* 636 F.2d 1199 (1st Cir.1980), *cert. denied,* 454 U.S. 821, 102 S.Ct. 105, 70 L.Ed.2d 93 (1981). To prove malice in this case, plaintiff must show improper motive, intent to abuse the company's disciplinary system by resorting to it under pretense, or

**3.** The NRAB dismissed the claim for lack of jurisdiction over a claim by an employee who

was not part of an organized collective bargaining unit. 45 U.S.C. § 153 First (i).

reckless disregard of plaintiff's rights. *See Ezekiel v. Jones Motor Co.,* 374 Mass. 382, 390, 372 N.E.2d 1281 (1978). Anti-union animus is an example of an improper motive. In light of our earlier conclusion that the district court erred in awarding summary judgment to MDT on Stepanischen's claim that he was fired because of his union activity, we reverse the district court's award of summary judgment for MDT on Stepanischen's defamation claim concerning Allen's June 12 memorandum.

IV. Denial of Motion to Amend Complaint

■ Stepanischen filed this action on August 7, 1981, in a three-count complaint alleging violation of RLA Section 2 Fourth, bad faith termination of an employee at will, and defamation. After seventeen months of discovery and after the court had set a discovery deadline of January 31, 1983, and had placed the case on the February trial list with pre-trial statements due February 2, 1983, Stepanischen filed on January 21 a motion to amend his complaint to add a count for breach of contract and to provide an additional reason for his bad faith termination (Count II). The district court denied the motion.

Where, as here, considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has the burden of showing some "valid reason for his neglect and delay". *Hayes v. New England Millwork Distributors, Inc.,* 602 F.2d 15, 19–20 (1st Cir.1979) (quoting *Freeman v. Continental Gin Co.,* 381 F.2d 459, 469 (5th Cir.1967)). Stepanischen has failed to meet that burden. Despite Stepanischen's claim to the contrary, the addition of new claims would likely have required additional discovery and caused further delay. Under the circumstances, the district court acted within its discretion in denying Stepanischen's motion to amend his complaint.

*The judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Because the inadequate presentation in district court by appellant contributed to this appeal, no costs shall be awarded. Each party to bear own costs.*