**ADVANCE FINANCIAL CORPORATION, Plaintiff, Appellee,**

**v.**

**ISLA RICA SALES, INC., Defendant, Appellant.**

**Antonio NOVOA, et al., Plaintiffs, Appellants,**

**v.**

**Boyd L. HOBBS, et al., Defendants, Appellees.**

**Nos. 84–1170, 84–1171.**

United States Court of Appeals, First Circuit.

Argued Sept. 6, 1984.

Decided Oct. 24, 1984.

Plinio Perez Marrero, Hato Rey, P.R., with whom Aurelio Garcia Morales, Naranjito, P.R., was on brief, for plaintiffs, appellants.

Ronald L. Rosenbaum, Hato Rey, P.R., with whom Woods, Rosenbaum, Luckeroth & Perez Gonzalez, Hato Rey, P.R., was on brief, for defendants, appellees.

Before COFFIN and BOWNES, Circuit Judges, and SELYA,[*] District Judge.

SELYA, District Judge.

These are consolidated appeals wherein Isla Rica Sales, Inc. (Isla), Antonio Novoa, and his spouse, Maria P. Novoa, jointly and severally complain of certain orders and judgments entered by the United States District Court for the District of Puerto Rico. Isla and Mr. and Mrs. Novoa, collectively, are herein sometimes referred to as "the appellants." The appellee in each instance is Advance Financial Corp. (AFC). The facts, though essentially undisputed, take some byzantine twists, and the procedural aspects of the two cases and their interrelationship are freighted with confusion. Accordingly, we begin by an orderly recitation of the material events, followed closely by an analysis of the proceedings below. It is only when a passable swath has been cut through this factual/procedural jungle that we can turn to a reasoned assessment of the issues presented by these appeals and a concise statement of the basis upon which we affirm the court below.

I. *Underlying Facts.*

A. *Background*

This saga starts with the lambent lure of easy money. In late 1982, Boyd L. Hobbs, known to his confreres as "Cotton," approached Leonel Diaz, a Puerto Rican entrepreneur, with a get-rich-quick proposition. The appellant Antonio Novoa acted as Diaz's interpreter in these negotiations. Hobbs, a convicted swindler, wore many hats at the time; among his millinery adornments, he held himself out to be the general manager of Monte Foods, Inc. (Monte-Alabama). Monte-Alabama was an Alabama corporation headquartered in Tuscaloosa. It was owned by a second corporation (Reliance Shipping) which was in turn owned by a third corporation (Hobbs Co.), of which Hobbs' wife was the sole shareholder.

Hobbs informed Diaz that he and Monte-Alabama had locked up favorable contracts with egg producers in Mississippi, Indiana, Georgia, and Alabama; that they had ready markets—indeed, agreements—for the profitable resale of these eggs; and that they lacked only the wherewithal to capitalize the venture. He asked for $100,000, and offered an extremely attractive return on investment.

Whatever his reliability might be as to the delivery of eggs, Hobbs was certainly no slouch when it came to delivering a slick sales pitch. On December 7, 1982, an agreement was signed whereby Novoa[1] put up the $100,000; in turn, Hobbs and Monte-Alabama guaranteed repayment of the funds and agreed to pay Novoa a return on investment ranging from thirty percent to forty-six percent. Novoa, who had no prior experience in the egg business, left himself pretty much at Hobbs' mercy: the entire contract comprised two hundred and eighty-nine words; it identified neither the sources of supply nor the sales outlets for the hypothetical eggs; and it did not commit Hobbs or his corporation to any firm temporal deadlines or the like. No exclusivity was expressed or implied, and Hobbs remained at liberty to deal freely in the world of eggs in other ventures.

---

[*] Of the District of Rhode Island, sitting by designation.

[1]. The record is murky as to Novoa's emergence as a principal in the transaction. There is some suggestion that he was fronting for Diaz, who was supposedly debarred from direct participation by the terms of an existing covenant not to compete. For our purposes, however, any behind-the-scenes arrangement between Novoa and Diaz is wholly immaterial. We will, therefore, treat Novoa as the real party in interest under the December 7 contract.

Novoa transferred the money and Hobbs' plot was thus hatched.

It should come as no surprise that Hobbs' motives proved to be foul. After pocketing the cashier's cheque which Novoa gave him, Hobbs in short order sojourned forth to Atlanta. On January 10, 1983, he formed a brand, spanking new corporation which, perhaps as a creature of habit, he also called Monte Foods, Inc. (Monte-Georgia). Monte-Georgia had its own officers, directors and employees (largely distinct from Monte-Alabama), rented offices in Atlanta to serve as its principal place of business, and began trafficking in eggs. The record is devoid of any evidence that Monte-Georgia coopted any of the assets of Monte-Alabama, or that any of Novoa's loosely-guarded dollars flowed into, or benefitted, Monte-Georgia.

At about the same time, Hobbs wangled an introduction to Andre James Perry, the president and chief executive officer of AFC. Likewise based in Georgia, AFC was in the commercial factoring game. It was qualified to do business only in its home state. AFC, through Perry, agreed to supply conventional accounts receivable financing to Monte-Georgia. On January 10, 1983, the appellee filed a UCC–1 form with the clerk of the superior court of Cobb County, Georgia, to perfect its security interests. There is no question but that, under Georgia law, the filing was duly accomplished.

In general, the arrangement followed a familiar pattern. Monte-Georgia would effect a sale, and would then assign the account to AFC. The proposed invoice would accompany the proffered assignment. The factor would conditionally accept each assignment, and then verify the shipment of the eggs to the customer and their receipt in good condition. Once AFC was satisfied in these respects, it would release funds to Monte-Georgia against the account.[2] AFC would then stamp the prepared Monte-Georgia invoice with a special notification clause in bold red lettering, and would forward the invoice to the customer for payment on agreed terms (usually, net fourteen days or net twenty-one days). The stamped special notification language placed by AFC on each invoice read as follows:

This bill assigned

MAKE CHECK PAYABLE TO:
Advance Financial Corp.
270 Carpenter Dr., N.E.
Suite 460
Atlanta, Georgia 30328
Tel. (404) 256–2123
Promptly notify above of any returns, claims or disputes

The customer would then make payment for the goods directly to AFC. Hobbs testified, without contradiction, that the availability of AFC's financing was the key factor leading to the incorporation of Monte-Georgia and to basing it in Atlanta.[3]

Meantime, Novoa had not been idle. Although it was not mentioned in his investment agreement with Hobbs and Monte-Alabama, Novoa, if gastronomical metaphors may be mixed, apparently had other fish to fry in connection with the joint venture. On December 31, 1982, he participated in the incorporation of Isla. Isla would, as Novoa envisioned it, buy Hobbs' wares and distribute the eggs as a wholesaler in Puerto Rico. Parenthetically, it might be added that Novoa is plainly a man of considerable talent; not many would aspire to skim cream off eggs. Virtually all of Isla's issued and outstanding stock was held by Diaz, but Novoa owned a two percent interest.[4] He was also Isla's vice-pres-

---

2. In most—if not all—cases, AFC's payments were forwarded directly to the egg producer, to be credited against Monte-Georgia's indebtedness to its vendor.

3. There is reason to believe that Hobbs, ever inventive, may have been doubling up by pledging certain accounts with more than one factor. Yet, despite the dim view which any court must take of such a nefarious practice, that aspect of Hobbs' machinations does not pertain directly to the issues before us.

4. Marta Diaz, not otherwise identified, also subscribed for two percent of the stock. The appellee suggests that Marta Diaz was in reality Maria Novoa. We see no need, for purposes of the

ident and general factotum; and his wife, Maria, worked as Isla's controller.

With this infrastructure in place in early 1983 the series of events which gave rise to the inevitable denouement began to unfold in earnest.

## B. *The Specific Transactions*

Subsequent to January 10, 1983, Isla started to purchase eggs through Hobbs. And, as shipments were made, Monte-Georgia presented and assigned invoices to AFC. The latter, after preliminary verification as described *ante*, purchased the accounts and mailed the invoices from Georgia to Isla in Puerto Rico. In addition to the scarlet-hued notification which emblazoned each invoice, AFC contemporaneously submitted a statement of account, which invariably included the following language:

> Please be advised that this account, including the attached invoices covering goods and/or services provided by MONTE FOODS, INC. DUNS NUMBER 0-0-0 has been sold and assigned to Advance Financial Corporation. The respective invoices are listed below and are payable only to Advance Financial Corporation at the address below—to whom prompt notice must be given of returns, claims or disputes of any kind.

None of the invoices or statements indicated the state of incorporation of "Monte Foods, Inc." The appellants make much of the fact that some of the documents submitted to Isla (including in various instances bills of lading which accompanied the merchandise and certain of the invoices themselves) showed an Alabama address for the seller. Yet, this strikes us as totally beside the point: the evidence is undisputed that Monte-Georgia maintained what

amounted to a branch office in Tuscaloosa, where it shared telex and other facilities with a bevy of corporate entities associated in some way with the prolific Mr. Hobbs. And, the record is similarly clear that Monte-Alabama was not engaged in the merchandising of eggs during this period. The most that can be said for the appellants' position is that they may have *thought* that they were buying comestibles from Monte-Alabama. But, the thought was apparently unfounded. On this record, AFC in no way can be said to have lulled the appellants into such a false sense of complacency.

Isla never protested the invoices or the statements; to the contrary, it made timely payments to AFC. During the interval of slightly over two months ending May 23, 1983, Isla remitted in excess of $270,000 to AFC on account. All bills for merchandise delivered through May 5 were satisfied by May 23. Maria Novoa wrote most of the checks, and Antonio Novoa signed them. In this same time frame, Hobbs made some monthly interest payments of $800 apiece on Novoa's investment.[5]

Then, the bubble burst. The Novoas, having grown disenchanted with Hobbs, brought suit against him and Monte-Alabama in the San Juan Superior Court on May 27, 1983, claiming breach of the investment contract. Isla thereupon assumed a hard-boiled stance and made no further payments to the factor. Between May 6 and May 27, however, AFC had accepted assignment of eleven incremental invoices totalling at least $138,480,[6] each of which was duly forwarded to Isla. These remain unpaid. Isla has never denied that it received the eggs, nor that the pricing as reflected by the invoices was other than accurate. The commencement of the first

---

cases before us, to engage in the genealogical goose-chasing which appraisal of this suggestion would entail.

5. The manner in which this monthly figure was derived is obscure. While the December 7 agreement did off-handedly refer to the payment of "interest on the investment on a monthly basis," neither the rate nor the amount to be paid was specified.

6. There was some dispute as to whether the sum owed to AFC was $138,480 (as the appellants conceded) or $152,640 (as the appellee initially claimed). This disagreement has been rendered moot, as AFC stipulated that it will accept the lesser figure in full satisfaction of its claims.

suit, however, marks the point at which we must commence our journey through the procedural thicket.

## II. *The Cases at Bar.*
### A. *Civil Action No. 83–1522 (Appeal No. 84–1171)*

As noted above, it was the Novoas who first sought judicial intervention, and who chose the Puerto Rican courts as their forum. After the suit was filed in the superior court in late May, the Novoas in early June obtained an attachment of monies due from Isla to Monte Foods, Inc. The writ of attachment did not differentiate between Monte-Alabama and Monte-Georgia.[7] Isla delivered the sum of $94,320 to the superior court sheriff on June 13 and paid over $44,160 shortly thereafter, all in pursuance of the garnishment. The record is abundantly clear that these funds, aggregating $138,480, represented the payments due by Isla on the eleven incremental invoices.[8] Hobbs and Monte-Alabama were served with process in the superior court action at about the time that the attachment issued. On June 30, 1983, they seasonably removed the case to the United States District Court for the District of Puerto Rico, 28 U.S.C. §§ 1441, 1446, properly alleging diversity of citizenship and the existence of the requisite amount in controversy. *See* 28 U.S.C. § 1332. The removed action was docketed in the federal district court as C.A. No. 83–1522.

Hot upon the heels of the removal, AFC sought leave to intervene, Fed.R.Civ.P. 24, asserting that the attached funds belonged to it. That motion was granted. Immediately thereafter, AFC filed an application for a show-cause order. The district court granted the motion, and set the case down for hearing on July 22 (later rescheduled to August 1) as to the existence *vel non* of

good cause to vacate the attachment and to release the disputed funds to the appellee.

### B. *Civil Action No. 83–1460 (Appeal No. 84–1170)*

In approximately the same time frame, a second case was commenced. On June 22, 1983, AFC sued Isla in the United States District Court for the District of Puerto Rico, seeking to collect the accounts receivable. The case was there docketed as C.A. No. 83–1460. Here, too, the court's diversity jurisdiction, 28 U.S.C. § 1332, was invoked. Isla answered the complaint and simultaneously moved under Fed.R.Civ.P. 56 for summary judgment in its favor, contending in effect that its liability for the charges had vanished when it paid over the billed amounts pursuant to the attachment. And, on August 1, Isla moved to consolidate 83–1460 with 83–1522. Fed.R.Civ.P. 42(a).[9] Later that month, AFC filed its opposition to Isla's motion and cross-moved for summary judgment in its favor.

### C. *Further Proceedings below*

From and after August 1, the two cases, like twin tributaries at the river's mouth, seem to have run together. On that date, the show-cause hearing was held. Several witnesses testified and extensive documentary evidence was received. The district judge took the matter under advisement. He subsequently issued a thoughtful memorandum opinion in which he sifted the pertinent facts, analyzed the relevant law, and held that "intervenor's [AFC's] claim to the Isla payments has priority over that of plaintiffs [Mr. and Mrs. Novoa] ...," *Novoa v. Hobbs*, C.A. No. 83–1522, slip op. at 6 (D.P.R. Aug. 8, 1983). Being uncertain as to the exact amount to which AFC was entitled, however, the district judge ordered $44,160 released to the appellee

---

**7.** Indeed, there is no proof that the appellants were, at the time, cognizant of the existence of *two* such corporations. We assume, as they urge us to do, that they were not.

**8.** There is evidence of the delivery of a further amount to the sheriff. But, this has not been claimed by the appellee and is of no consequence for our purposes. *See* note 6, *ante.*

**9.** No objection was ever interposed to Isla's motion to consolidate. While it was not formally granted until August 30, it is plain that the parties and the court treated the cases as one from August 1 forward.

and left open the question of entitlement to the remaining funds. *Id.* at 6–7.

The appellee moved for reconsideration, pointing out, inter alia, that Isla's affidavit in 83–1460 (filed as part and parcel of Isla's summary judgment motion) clearly demonstrated that the additional sum of $94,320 was attributable to invoices factored through AFC. The Novoas, not to be outdone, also sought reconsideration, asseverating that the district court did not take into account the two-card Monte game which Hobbs had been playing. The district judge granted AFC's motion on September 28, thereby confirming its entitlement to the full $138,480; on October 5, he denied the Novoas' request for a rehearing.

Nothing daunted, the appellants changed counsel and filed a further motion for reconsideration. Contemporaneously, AFC moved under Fed.R.Civ.P. 54(b) for the immediate entry of judgment in its favor, averring that it had intervened in 83–1522 solely to challenge the attachment and that there was no just cause for delay. The appellants never opposed this motion. Some four weeks later, on November 28, 1983, the Novoas moved under Fed.R. Civ.P. 60(b) for relief from the previous orders of the district court. On December 9, the district court heard and denied the two new motions filed on behalf of Mr. and Mrs. Novoa, but did not act on the appellee's Rule 54 motion.

On December 13, 1983, the district court made the cheese binding. Judge Acosta entered an order in *both* cases, granting AFC's motion for summary judgment in 83–1460, granting AFC's Rule 54(b) motion in 83–1522, and leaving unsettled only the question of whether AFC was entitled to $138,480 or $152,640. Following the appel-

lee's concession that the lesser amount would satisfy its claim in full, *see* note 6 *ante*, a summary judgment in favor of the appellee was entered in both cases on January 4, 1984, and was amended nunc pro tunc to correct procedural deficiencies on February 6, 1984. The instant appeals followed in due course.

### III. *The Merits.*

#### A. *Standard of Review*

█ In our approach to the merits of the controversy, we note, first, the appellee's contention that we should apply the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). This argument derives from the conduct of a plenary hearing by the district court on August 1, at which both sides had a free hand in the presentation of evidence. But, the district court speaks to us primarily through its decrees; and the orders for judgment in each case are plainly labelled as summary in nature. Thus, we apply the yardstick of Fed.R.Civ.P. 56 to the matters at bar; cognizant, withal, that the appellants, both in their briefs and at oral argument before us, disclaimed the existence of issues of material fact and beseeched this court that they—not AFC—were entitled to judgment as a matter of law.[10]

In accordance with this determination, we can affirm the decisions below only if we are fully satisfied that there is no genuine dispute as to any relevant fact issue and that the appellee is, as a matter of law, due the relief which the district court awarded. *Emery v. Merrimack Valley Wood Products, Inc.,* 701 F.2d 985, 986 (1st Cir.1983); *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975); *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 745 (1976);

---

**10.** Still, the argument that the August 1 showcause hearing constituted a trial, justifying review under Rule 52(a)'s "clearly erroneous" standard, is a plausible one. The district court heard several witnesses, had ample opportunity to evaluate their credibility, and received extensive documentary evidence, all on the narrow issue of the priority of competing claims to the attached funds. However, while the August 8 decision, standing alone, would appear to fit within the rubric of Rule 52(a), the district

court plainly considered itself to be granting summary judgment when the cases were ultimately set to rest some months later. Given the label which the lower court affixed to its own order—and the tenor of its contents—we defer to the trial judge's characterization and treat the matter as one of summary judgment. In any event, the issue is purely academic since we affirm even under the more astrictive summary judgment standard. *See* text *post.*

*Gonsalves v. Alpine Country Club*, 563 F.Supp. 1283, 1285 (D.R.I.1983), *aff'd*, 727 F.2d 27 (1st Cir.1984). And, in so doing, we must view the evidence in the light most favorable to the appellants, *Stepanischen v. Merchants Despatch Transportation Corp.*, 722 F.2d 922, 928 (1st Cir.1983); *Emery*, 701 F.2d at 986; *John Sanderson Co. (WOOL) Pty. Ltd. v. Ludlow Jute Co.*, 569 F.2d 696, 698 (1st Cir.1978), drawing therefrom all reasonable inferences in their favor. *Santoni v. Federal Deposit Insurance Corp.*, 677 F.2d 174, 177 (1st Cir. 1982); *O'Neill v. Dell Publishing Co.*, 630 F.2d 685, 686 (1st Cir.1980).

### B. *The Record*

■ There is a second threshold question to be faced here. The appellants urge that, since AFC's motion for *brevis* disposition was filed only in 83–1460, the court below erred in relying on evidence adduced in 83–1522 in reaching the determination. Yet, this contention overlooks or misperceives the consolidation of the two cases in August, 1983 and it further attempts unduly to restrict the wide sweep of Fed.R. Civ.P. 56(e). If a party, for summary judgment purposes, may rely on affidavits which "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify to the matters stated therein," *id.*, and if depositions and answers to interrogatories may be considered, *see id.*, there is no sensible rationale which would preclude reliance on sworn testimony faithfully recorded during the conduct of a judicially-supervised adversarial proceeding. All of the hallmarks of reliability attend upon such trial transcripts. *See, e.g., Fisher v. Shamburg*, 624 F.2d 156, 162 n. 7 (10th Cir.1980) (though summary judgment was improper on other grounds, trial court properly considered the transcript of the defendant's earlier criminal trial); *Askew v. Bloemaker*, 548 F.2d 673, 679 (7th Cir. 1976) (district court may properly consider a certified transcript on a motion for summary judgment); *Langston v. Johnson*, 478 F.2d 915, 917 n. 17 (D.C.Cir.1973) (collecting cases).

We conclude, therefore, that the transcript of the August 1 hearing was properly before the district judge when he acted upon the summary judgment initiative.

### C. *The Undisputed Facts*

Viewing the evidence in the light most hospitable to the appellants, certain facts are nevertheless crystal clear. AFC's advances were used to pay for the eggs; and the eggs, in turn, were shipped to and received by Isla. They were accurately priced. AFC had a validly perfected security interest in the resultant accounts receivable; and Isla was not only on notice of the assignment to AFC, but had consistently honored that assignment, without demurrer, over a substantial period of time.

Although the Novoas apparently assumed that Monte-Alabama was the purveyor of the eggs, there is not a shred of evidence in the record to buttress that assumption.[11] Monte-Georgia warranted its ownership of the due bills; AFC released funds to the egg producers for the account of Monte-Georgia; and interim payments made by Isla to AFC were credited to Monte-Georgia's line. The evidence is uncontradicted that Monte-Alabama was not engaged, directly or indirectly, in the egg business during the first six months of calendar 1983. And, the mere fact that some of the documentation anent the eggs originated in the state of Alabama, standing alone, is meaningless: that is logically consistent both with the undisputed evidence that Monte-Georgia maintained a branch office in Tuscaloosa, and with AFC's unrebutted showing that the prime

---

11. The appellants point to an isolated remark in the testimony of Maria Novoa, Record Appendix at 68, which they contend can be read to the contrary. What this witness said, however, was descriptive of the *place* from which the invoices emanated, and did not address the issue of which corporation generated the bills. The appellants, after all, were blissfully unaware that two Monte Food corporations existed at the time they received the statements. *See* note 7, *ante*. And, in any event, the invoices themselves belie any conclusory attempt to characterize Monte-Alabama as their progenitor.

producer of the eggs shipped to Isla was Rose Acre Farms, located in Alabama.

The amounts owed by Isla and to AFC, up to $138,400, were not in dispute; nor were any of the facts anent the manner in which the appellee perfected its security interest. And, it is beyond cavil that Isla (and the Novoas) knew of AFC's security interest as early as March, 1983. The appellants have never disputed that AFC was a Georgia corporation, headquartered there, or that the financing deal was cut in Georgia. As Isla and AFC both argued to the district court when they cross-moved for summary judgment, these cases were wholly dependent upon the application of settled principles of law to essentially uncontroverted facts.[12]

### D. *The Applicable Law*

■ Having reached the crux of the matter at long last, the legal issues in the case need not detain us long. Inasmuch as the district court's diversity jurisdiction was invoked, the substantive law of Puerto Rico controls, *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), including the commonwealth's choice-of-law rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). The district judge, whose specialized knowledge of such matters we respect, *Laureano-Agosto v. Garcia-Carabello,* 731 F.2d 101, 103 (1st Cir.1984); *Gual Morales v. Hernandez Vega,* 604 F.2d 730, 732 (1st Cir.1979), found that the courts of Puerto Rico would in these circumstances look to the law of Georgia. We concur.

Article 10 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 10, provides that "[p]ersonal property is subject to the laws of the nation of the owner thereof ...". Thus, all rights and causes of action pertaining to personalty must be determined in accordance with the statutes most intimately connected with the owner. *See* 1 Manresa, *Codigo Civil Espanol* 231 (7th ed. 1956). In this case, both the assignor (the "owner," in contemplation of local law) and the assignee are Georgia corporations with principal places of business located in Georgia. The factoring agreement itself was consummated there. The district court properly applied Georgia law as a necessary adjunct to determining the competing claims of entitlement to the attached funds.[13]

Georgia's Uniform Commerical Code provides that the law of the jurisdiction in which the debtor is located governs the perfection of security interests. *See* 11 Ga.Code Ann. § 9–103(3)(b) (1982). A debtor is deemed to be situated at its "chief executive office" if it has multiple places of business. 11 Ga.Code Ann. § 9–103(3)(d) (1982). Since Monte-Georgia had its headquarters in Atlanta, the key question is whether or not AFC (which does no business whatever outside of Georgia and which cannot, under its charter and licenses, engage in foreign business) properly perfected the financing agreement under Georgia law.

■ Georgia requires that a financing statement, to be perfected, be filed, 11 Ga.

---

12. The appellants argue before us that, if extra time had been granted to them for discovery, *cf.* Fed.R.Civ.P. 56(f), they might have been able to shed new factual light on the issues. The short answer to this imprecation is that no such deferral was requested in the district court, and we cannot consider it here as a matter of first impression. *United States v. Kobrosky,* 711 F.2d 449, 456 (1st Cir.1983); *Johnston v. Holiday Inns, Inc.,* 565 F.2d 790, 797 (1st Cir.1977).

13. We further note that, in any event, the laws of Puerto Rico, with respect to factoring and assignments, cannot be construed to apply in this case. As Judge Acosta correctly observed, the Puerto Rico Factor's Lien Act, 10 L.P.R.A.

§§ 551 *et seq.,* and the Assignment of Accounts Receivable Act (AARA), 10 L.P.R.A. §§ 581 *et seq.,* apply only to entities with offices in Puerto Rico. The appellee had no such facility. Factors' liens are to be recorded "in the district in which the principal office or ... the main business establishment of the debtor is located *in Puerto Rico,*" 10 L.P.R.A. § 554 (emphasis added), and Monte-Georgia had no such presence in the commonwealth. Similarly, the form which is incorporated in the AARA, 10 L.P.R.A. § 583, requires the inclusion of the assignor's principal business address in Puerto Rico, but makes specific provision for the assignee to write in an office address outside of Puerto Rico.

Code Ann. § 9–302(1) (1982), and stipulates that the filing take place in the office of the clerk of the superior court in the county of the debtor's principal place of business in the state. 11 Ga.Code Ann. § 9–401(1)(b) (1982). AFC perfected its lien with an adroitly drawn financing statement, *see* 11 Ga.Code Ann. § 9–402 (1982), recorded in the Superior Court of Cobb County, Georgia, on January 7, 1983. The appellants do not question that Monte-Georgia's command post is within that county.[14] The Novoas did not acquire an interest in the monies at issue until they secured the within-described attachment on June 13, 1983. AFC's claim was both prior in time and prior in right to the rival claim of the Novoas.

Such a result in no way compromises the public policy of Puerto Rico, for "the law of Puerto Rico is that the assignee who first notifies the debtor of his assignment prevails." *American Fire & Casualty Co. v. First National City Bank*, 411 F.2d 755, 757 (1st Cir.1969) (citations omitted), *cert. denied*, 396 U.S. 1007, 90 S.Ct. 563, 24 L.Ed.2d 499 (1970). And, the duad of Montes does not, in the utter absence of any evidence of complicity or double-dealing by AFC, obviate the financing agreement or undermine the result. The district court properly awarded the funds to the appellee. 11 Ga.Code Ann. § 9–312(5)(a) (1982).

## IV. *Conclusion.*

The Novoas, having welcomed Hobbs as the goose who would lay the golden eggs, are doubtless aggrieved by the way in which the eggs were later scrambled. It may well be true, as Mr. and Mrs. Novoa argued before us, that Hobbs, by guile and iniquitous means, has "dried their well." But, the fact that they were gulled does not allow the courts to poach upon settled principles of commercial law to the detriment of an innocent third party whose legal rights are unmistakably superior to

those of the appellants. Based upon the uncontroverted facts of record, AFC's corporate hands are clean. It had a validly-perfected first position security interest in and to the receipts attributable to the egg sales. The orders of the district court consigning the funds owed by Isla to the appellee are inexpugnable, and the judgments below are hereby

*Affirmed.*

---

**14.** While Atlanta is, at least to sports fans familiar with its stadium, commonly thought of as being situated in Fulton County, some parts of the city (including Perimeter Way, where Monte-Georgia rented offices) are actually within the boundaries of Cobb County.