Pacamor Bearings v. Minebea, Ltd.    CV-90-271-SD  07/13/95 P

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Pacamor Bearings, Inc., et al


v.                                          Civil No. 90-271-SD


Minebea Co., Ltd., et al


O R D E R


Pending before the court at this time is a plethora of motions; this order addresses the following of same: (1) plaintiffs' motion for leave to amend their complaint; (2) defendants' motion for partial summary judgment; (3) defendants' motion to dismiss or, in the alternative, for entry of an order compelling substitution or joinder of Wells Fargo Bank, N.A., as plaintiff; and (4) defendants' motion for certification under 28 U.S.C. § 1292(b) of issues regarding plaintiffs' standing to sue. Each motion has been objected to by the nonmoving party.


A.  Plaintiffs' Motion to Amend Complaint (document 111)

Plaintiffs move for leave to file an amended complaint which (1) adds two claims for relief under the Sherman Act, 15 U.S.C. § 2; (2) deletes the conspiracy claims previously dismissed by this

court;[1] and (3) deletes plaintiffs' claim for relief under the Anti-Dumping Act of 1916. Defendants object only to plaintiffs' attempt to add two Sherman Act claims to their complaint.

In addition, plaintiffs have filed a motion for leave to file a reply memorandum (document 121), and defendants have filed a corresponding motion for leave to file a response to said reply memorandum (document 122). Both motions are herewith granted, and the memoranda attached thereto have been filed as of the date of this order. Further, there being no objection to plaintiffs' request to delete their previously dismissed conspiracy claims (Counts II and IV) and their Anti-Dumping Act claim (Count III), plaintiffs' motion to amend is herewith granted with respect to said claims. The court turns now to plaintiffs' request to add two Sherman Act claims to their complaint.

1. Rule 15(b)

Plaintiffs assert, in part, that their motion to amend is intended to conform the pleadings to the evidence in accordance with Rule 15(b), Fed. R. Civ. P.

Rule 15(b) provides in relevant part that "[w]hen issues not raised by the pleadings are tried by express or implied consent

---

[1]In an order dated January 14, 1991, this court dismissed plaintiffs' conspiracy claims for failure to state a claim.

of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Rule 15(b) is generally invoked when the need to amend the pleadings does not become apparent until the trial has commenced or, in some cases, until the trial has come to a close. See generally, 6A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1491 (1990) (hereinafter WRIGHT & MILLER). See also DCPB, Inc. v. Lebanon, 957 F.2d 913, 916-17 (1st Cir. 1992).

Procedurally, this action is still in the pretrial stages. Therefore, it should go without saying that the issues raised in plaintiffs' proposed Sherman Act claims have not been "tried". Further, as is evident from defendants' opposition to plaintiffs' motion, defendants have not given their express or implied consent to trial of the issues raised in said proposed claims. For these reasons, the court finds that plaintiffs are not entitled to amend their complaint to conform to the evidence under Rule 15(b) at this stage in the proceedings. Instead, plaintiffs' motion to amend must be evaluated under Rule 15(a), Fed. R. Civ. P.

### 2. Rule 15(a)

Rule 15(a), Fed. R. Civ. P., provides in relevant part that leave to amend a party's pleadings "shall be freely given when

3

justice so requires."  The Supreme Court, interpreting Rule 15(a), has offered the following guidance to courts on the question of whether justice requires that a motion to amend be granted.

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be "freely given."

Foman v. Davis, 371 U.S. 178, 182 (1962).  Accord Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994) ("Leave to amend is to be 'freely given' unless it would be futile or reward, inter alia, undue or intended delay." (citations omitted)); Executive Leasing Corp. v. Banco Popular de Puerto Rico, 48 F.3d 66, 71 (1st Cir. 1995).

"A party's belated attempt to revise its pleadings requires that a court examine the totality of the circumstances and exercise sound discretion in light of the pertinent balance of equitable considerations."  Quaker State Oil Refining Corp. v. Garrity Oil Co., 884 F.2d 1510, 1517 (1st Cir. 1989).  "While courts may not deny an amendment solely because of delay and

4

without consideration of the prejudice to the opposing party, it is clear that 'undue delay' can be a basis for denial . . . ." Hayes v. New England Millwork Distribs., Inc., 602 F.2d 15, 19 (1st Cir. 1979) (citations omitted).  Further, "'[w]here . . . considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has the burden of showing some "valid reason for his neglect and delay."'"  Grant v. News Group Boston, ___ F.3d ___, ___, No. 94-2191, 1995 U.S. App. LEXIS 9740, at *15 (1st Cir. Apr. 28, 1995) (quoting Stepanischen v. Merchants Despatch Transp. Corp., 722 F.2d 922, 933 (1st Cir. 1983) (quoting Hayes, supra, 602 F.2d at 19-20)).

     a.  Undue Delay

This action was filed on June 15, 1990, and has thus been working its way toward trial for some five years.  In light of the considerable amount of time that has elapsed between the filing of the complaint and the pending motion to amend,[2] the court finds that plaintiffs have "'the burden of showing some valid reason for [their] neglect and delay.'"  Grant, supra, ___ F.3d at ___, 1995 U.S. App. LEXIS 9740, at *15 (quoting Stepanischen, supra, 722 F.2d at 933) (other citations omitted).

Plaintiffs maintain that there has been no undue delay here

_____

[2]Plaintiffs' motion to amend was filed on March 10, 1995.

5

because plaintiffs sought to amend their complaint shortly after new evidence which supported a Sherman Act claim came to light. After discovering this "new" evidence, plaintiffs assert they sought defendants' consent to their motion to amend by letter dated September 28, 1994. A series of communications between the parties followed, culminating in defendants' November 10 refusal to consent to the motion to amend.

Shortly thereafter, the parties agreed to mediate this case and filed a joint motion to hold the proceedings in abeyance pending mediation. Said motion, which was granted by the court on December 15, 1994, provided in relevant part,

> In order for the parties to devote all of their energy and attention to the settlement process, they have agreed, subject to the approval of this Court, that these proceedings, including discovery and filing of additional motions, should be held in abeyance temporarily. <u>The parties have also agreed that the suspension of proceedings and lapse of time associated therewith shall be without prejudice to their positions with respect to any issue relating to the timing or timeliness of filings or other matters in connection with this case.</u>

Joint Motion filed Dec. 9, 1994 (document 105) ¶ 2 (emphasis added).

On February 10, 1995, the parties filed with the court a Joint Status Report and Request to Renew Motions, indicating that their mediation had been unsuccessful. By letter dated February

6

17, 1995, plaintiffs renewed their request for defendants' consent to their motion to amend. Defendants declined to give such consent, and plaintiffs filed the pending motion on March 10, 1995.

Defendants first contend that plaintiffs have failed to adequately explain the three-month delay between plaintiffs' first notification to defendants of their intent to amend and their actual filing of the motion.[3]

In light of plaintiffs' diligent efforts between September 28 and November 10, 1994, to obtain defendants' consent to their motion to amend, the parties' subsequent agreement to mediate the case, and their corresponding agreement that the lapse of time associated with their mediation efforts would not prejudice their positions "with respect to any issue relating to the timing or timeliness of filings or other matters in connection with this case," Joint Motion ¶ 2, the court finds that plaintiffs have met their burden of showing some valid reason for the delay between September 1994 and March 1995. Accordingly, the court turns to the question of whether plaintiffs have shown some valid reason why their proposed

---

[3]Defendants exclude from their calculations the time between December 15, 1994, when the court stayed the case pending mediation, and February 10, 1995, when the parties notified the court that their mediation efforts had failed.

amendments were not made prior to September 1994.

Plaintiffs justify their delay by explaining that they notified defendants of their intent to add the proposed Sherman Act claims as soon as new evidence supporting such claims came to light during the course of discovery. Defendants respond that plaintiffs' "claim of 'newly discovered evidence' is disingenuous at best," Defendants' Opposition Memorandum at 5, and cannot explain the four-year delay between the filing of this action and plaintiffs' current attempt to amend.

Plaintiffs repeatedly indicate in their motion and related memoranda that the proposed Sherman Act claims are "based on the same wrongful conduct" and the "same operative facts" as the claims set forth in their Second Amended Complaint.[4] Affidavit

_____

[4]Specifically, plaintiffs assert they

have clearly made allegations in their earlier pleadings that to the extent that Defendants engaged in predatory conduct, it was with the intent to harm competition. See Second Amended Complaint ¶¶ "33," "43," "59" and "76." Plaintiffs have also made allegations of predatory and other anti-competitive conduct in the existing Complaint. See Second Amended Complaint, ¶¶ "1," "33," "37," "38," "40," "41," "42," "44," "48," "51," "58," "64," "68," "69," "70" and "76". These allegations state that Plaintiffs' claims were based on the belief that Defendants' culpable conduct was intentional and was designed to destroy competition. The allegations in the existing Complaint also state that Defendants did

of Daniel M. Sleasman ¶¶ 10-13 (attached to Plaintiffs' Motion). Simultaneously, plaintiffs contend that their proposed claims are based on newly discovered evidence such that they could not have moved to amend their complaint any earlier.

One of the examples of newly discovered evidence plaintiffs cite is evidence that defendants engaged in a multi-year fraud involving the substitution of a new, less costly "DD" steel for the industry-recognized 440C stainless steel in the manufacture of miniature & instrument (M&I) ball bearings. Although the evidence required to support this allegedly wrongful conduct may be described as "newly discovered," plaintiffs cannot maintain that they were unaware until recently of the fact that said conduct occurred. Indeed, their Second Amended Complaint is based in part on the allegation that defendants imported and sold "ball bearings which were not made of the grade of metal represented by Defendants," Second Amended Complaint ¶ 44, and that defendants profited from their "misrepresentations .. . of the bearings as containing 440C grade steel," id. ¶ 68.

As additional examples of the "newly discovered evidence" upon which the proposed Sherman Act claims are based, plaintiffs

_____

succeed to some degree in this illegal enterprise.

Plaintiffs' Memorandum at 12.

point to evidence showing that defendants engaged in predatory pricing by selling ball bearings below cost. Again, although this evidence may be "new," the contention that defendants engaged in such conduct is not. In their Second Amended Complaint, plaintiffs allege that defendants "commonly and systematically imported, sold and caused to be imported and sold miniature ball bearings within the United States at a price substantially less than the market value or wholesale price of such articles," id. ¶ 41, as well as "at a price substantially less than the actual cost of said article," id. ¶ 42. Plaintiffs further allege that "said sale and importation has been done with the intent of destroying or injuring the ball bearing industry in the United States." Id. ¶ 43.

Plaintiffs first notified defendants of their intent to seek leave to amend their complaint in September 1994. Review of the record in this case leads the court to conclude that the "newly discovered evidence" plaintiffs point to in order to justify their four-year delay in seeking to amend their complaint is evidence that supports the allegations already set forth in the Second Amended Complaint. The court further finds that the proposed Sherman Act claims are, as plaintiffs repeatedly contend, based on the same wrongful conduct as the claims set forth in their Second Amended Complaint. In light of these

10

findings, the court concludes that plaintiffs' four-year delay in seeking to add the proposed Sherman Act claims is properly characterized as "undue" delay for which plaintiffs have not provided an adequate justification.

### b. Prejudice to Defendants

Concomitant to the court's consideration of whether plaintiffs' delay was undue or something less is consideration of whether defendants will be prejudiced in any way if plaintiffs are permitted to add their proposed Sherman Act claims.

Plaintiffs contend, inter alia, that defendants will not be prejudiced by their proposed claims because the amendment "merely provides an additional remedy based upon new evidence of the same type of acts already alleged in the Existing Complaint." Plaintiffs' Reply Memorandum at 10. Plaintiffs further contend that there is no prejudice to defendants because discovery is still pending and their amendments will not require any discovery extensions. Defendants counter that they will be prejudiced by the need to conduct additional discovery and obtain expert witnesses in order to define the relevant market and analyze their economic power in that market.

Under section 2 of the Sherman Act, it is illegal to "monopolize, or attempt to monopolize, or combine or conspire

11

with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2 (Supp. 1995).[5] Plaintiffs' proposed Sherman Act claims include a claim of actual monopolization and a claim of attempted monopolization.

In order to prove actual monopolization in violation of section 2, plaintiffs would be required to establish (1) that defendants possessed monopoly power[6] in the relevant market, and (2) "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); see also Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147,

---

[5]"The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest." Spectrum Sports, Inc. v. McQuillan, ___ U.S. ___, ___, 113 S. Ct. 884, 891-92 (1993) (citations omitted).

[6]"Monopoly power" is defined as "'the power to raise prices to supra-competitive levels or . . . the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market.'" U.S. Anchor Mfg. v. Rule Indus., 7 F.3d 986, 994 (11th Cir. 1993) (quoting American Key Corp. v. Cole Nat'l Corp., 762 F.2d 1569, 1581 (11th Cir. 1985)), cert. denied, ___ U.S. ___, 114 S. Ct. 2710 (1994).

1181-82 (1st Cir. 1994).  To prove the attempted monopolization, plaintiffs would be required to establish "(1) that the defendant[s] ha[ve] engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  Spectrum Sports, supra, 113 S. Ct. at 890-91.

Plaintiffs' proof of defendants' predatory or anticompetitive conduct is the same proof plaintiffs are relying upon to prove their existing claims.  Proof of such conduct may also be "sufficient to prove the necessary intent to monopolize . . . ."  Spectrum Sports, supra, 113 S. Ct. at 892.  Accordingly, additional discovery into these areas does not appear to be necessary if plaintiffs' proposed amendments are allowed.

However, in order to prove that defendants possessed actual monopoly power or a dangerous probability of achieving monopoly power, plaintiffs will be required to offer proof on how the relevant market is defined and on defendants' monopoly power or market share in the defined market.  See, e.g., U.S. Anchor Mfg., supra, 7 F.3d at 994 ("Defining the market is a necessary step in any analysis of market power and thus an indispensable element in the consideration of any monopolization or attempt case arising under section 2." (citing Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 177 (1965); American Key.

13

Corp., supra, 762 F.2d at 1579)); Spectrum Sports, supra, 113 S. Ct. at 892 ("[D]emonstrating the dangerous probability of monopolization in an attempt case . . . requires inquiry into the relevant product and geographic market and the defendant's economic power in that market.").

"Most attempts to measure monopoly power involve quantifying the degree of concentration in a relevant market and/or the extent of a particular firm's ability to control productive capacity in that market." U.S. Anchor Mfg., supra, 7 F.3d at 994. "'Relevant determinants of the market power of a . . . predator . . . include its absolute and relative market shares, and those of competing firms; the strength and capacity of current competitors; the potential for entry; the historic intensity of competition; and the impact of the legal or natural environment.'" Id. (quoting International Tel. & Tel. Corp., 104 F.T.C. 208, 412 (1984)) (citations and footnotes omitted in U.S. Anchor Mfg.).

The court, having reviewed the existing claims in this action, finds that the addition of plaintiffs' proposed Sherman Act claims would require discovery into matters that were not previously part of this action and that such discovery is likely to further delay these proceedings. Infusion of such matters into this case may also require the parties to obtain additional

experts in order to analyze defendants' economic power in the relevant market.

"'The further along a case is toward trial, the greater the threat of prejudice and delay when new claims are belatedly added.'" Executive Leasing, supra, 48 F.3d at 71 (quoting Rodriguez v. Banco Central Corp., 990 F.2d 7, 14 (1st Cir. 1993)). The court finds that at this stage in the instant action, defendants would be prejudiced if plaintiffs were allowed to amend their complaint by adding two Sherman Act claims.

Finding that plaintiffs' delay in moving to amend has been undue and that defendants will be prejudiced by such amendments, the court herewith denies plaintiffs' motion for leave to amend insofar as said motion seeks to add claims under section 2 of the Sherman Act.

B. Defendants' Motion for Partial Summary Judgment (document 73)

Defendants move for partial summary judgment on (1) plaintiffs' state law claims insofar as said claims involve alleged international price discrimination, (2) plaintiffs' Anti-Dumping Act claims, and (3) plaintiffs' unjust enrichment claim.[7]

---

[7]In what has become common practice for the parties to this action, defendants have filed a motion for leave to file a response to plaintiffs' objection to the instant motion (document 85), and plaintiffs have responded with a motion for leave to file a surreply to defendants' response (document 91). Said

As discussed at page 2 of this order, plaintiffs have dropped their Anti-Dumping Act claims from this action. Defendants' arguments with respect to said claims are therefore moot.

1. Summary Judgment Standard

Under Rule 56(c), Fed. R. Civ. P., summary judgment is appropriate if the evidence before the court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The summary judgment process

> involves shifting burdens between the moving and the nonmoving parties. Initially, the onus falls upon the moving party to aver "'an absence of evidence to support the nonmoving party's case.'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once the moving party satisfies this requirement, the pendulum swings back to the nonmoving party, who must oppose the motion by presenting facts that show that there is a "genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)). . . .

LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, ___ U.S. ___, 114 S. Ct. 1398 (1994).

"Essentially, Rule 56(c) mandates the entry of summary

_____

motions are herewith granted, and the memoranda attached thereto have been filed as of the date of this order.

16

judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Mottolo v. Fireman's Fund Ins. Co., 43 F.3d 723, 725 (1st Cir. 1995) (quoting Celotex Corp., supra, 477 U.S. at 322). When the nonmoving party bears the burden of proof at trial and fails to make such a showing, "there can no longer be a genuine issue as to any material fact: the failure of proof as to an essential element necessarily renders all other facts immaterial, and the moving party is entitled to judgment as a matter of law." Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994) (citing Celotex Corp., supra, 477 U.S. at 322-23), cert. denied, 115 S. Ct. 1958 (1995).

In determining whether summary judgment is appropriate, the court construes the evidence and draws all justifiable inferences in the nonmoving party's favor. Anderson, supra, 477 U.S. at 255; Data Gen. Corp., supra, 36 F.3d at 1159.

### 2. The State Law Claims

Plaintiffs assert claims under New Hampshire law for unfair competition (Count V), unjust enrichment (Count VI), and tortious interference with contract (Count VII). Defendants move for partial summary judgment as to said claims "insofar as they

17

involve alleged international price discrimination or allegedly illegal international pricing of the sort proscribed by the 1916 Anti-Dumping Act, 15 U.S.C. § 72, . . . because any such claims are pre-empted by federal law and because application of state law to such allegations would be unconstitutional . . . ." Defendants' Memorandum at 1.

Plaintiffs respond that they "never intended their state law claims to include 'international price discrimination,'" Plaintiffs' Memorandum at 15, and they therefore do not object to defendants' motion as long as the motion is limited to carving out conduct in violation of the Anti-Dumping Act from the state law claims. In stating that they do not object to defendants' motion thus framed, plaintiffs assert that their state law claims encompass other wrongful pricing practices such as predatory pricing, as well as unfair and anti-competitive conduct such as defendants' alleged misrepresentations about the composition of their products.[8]

Defendants' motion for partial summary judgment as to plaintiffs' state law claims is granted insofar as said claims

_____

[8]In their reply brief, defendants argue, inter alia, that plaintiffs' Second Amended Complaint fails to state a claim for predatory pricing. However, because this argument was not properly raised and briefed in defendants' motion, the court will not consider it here.

18

are based on allegations of international price discrimination or illegal international pricing in violation of the Anti-Dumping Act.  To the extent that plaintiffs' state law claims are based on other illegal conduct, said claims survive defendants' present motion.

### 3.  Unjust Enrichment

In Count VI, plaintiffs assert the following claim for unjust enrichment:

> Defendants have received all financial benefits, revenue and profits as a direct result of their misrepresentations (i) of the USA as the true country of origin for imported ball bearings and (ii) of the bearings as containing 440C grade steel.
> Defendants have received financial benefits and revenue as a direct result of selling bearings below cost.
> Defendants have profited and been enriched by the retention of revenue and profits and increased market share for miniature ball bearings at the expense of Plaintiffs.
> Said profits and enrichment are contrary to equity and are unconscionable to retain because they are against public policy favoring fair competition and trade.
> Defendants should be forced to make restitution to Plaintiffs for said unjust enrichment.

Second Amended Complaint ¶¶ 68-72.

Defendants move for summary judgment as to said claim, arguing that restitution for unjust enrichment is a quasi-

19

contractual remedy that does not apply to this case.  Defendants further argue that plaintiffs are not entitled to such a remedy because they conferred no "benefit" on defendants.

"'The doctrine of unjust enrichment is that one shall not be allowed to profit or enrich himself at the expense of another contrary to equity.'"  Cohen v. Frank Developers, Inc., 118 N.H. 512, 518, 389 A.2d 933, 937 (1978) (quoting American Univ. v. Forbes, 88 N.H. 17, 19-20, 183 A. 860, 862 (1936)).  See also RESTATEMENT OF RESTITUTION § 1 (1937) ("A person who has been unjustly enriched at the expense of another is required to make restitution to the other.").

"In the absence of a contractual agreement, a trial court may require an individual to make restitution for unjust enrichment if he has received a benefit which would be unconscionable to retain."  Petrie-Clemons v. Butterfield, 122 N.H. 120, 127, 441 A.2d 1167, 1171 (1982) (citing Morgenroth & Assocs., Inc. v. Town of Tilton, 121 N.H. 511, 514, 431 A.2d 770, 772 (1981); Presby v. Bethlehem Village Dist., 120 N.H. 493, 495, 416 A.2d 1382, 1383 (1980)).  "A plaintiff is entitled to restitution if he shows that there was unjust enrichment either through wrongful acts or passive acceptance of a benefit that would be unconscionable to permit the defendant to retain."  R. Zoppo Co. v. City of Manchester, 122 N.H. 1109, 1113, 453 A.2d

20

1311, 1313 (1982) (citing <u>Cohen</u>, <u>supra</u>, 118 N.H. at 518, 389 A.2d at 937); <u>see also</u> <u>Petrie-Clemons</u>, <u>supra</u>, 122 N.H. at 127, 441 A.2d at 1172 ("Unjust enrichment may exist when an individual receives a benefit as a result of his wrongful acts, or when he innocently receives a benefit and passively accepts it." (citing <u>Nute v. Blaisdell</u>, 117 N.H 228, 232, 374 A.2d 923, 925 (1977)).

It is the responsibility of the trial court to "determine whether the facts and equities of a particular case warrant a remedy in restitution." <u>Petrie-Clemons</u>, <u>supra</u>, 122 N.H. at 127, 441 A.2d at 1172 (citing <u>Presby</u>, <u>supra</u>, 120 N.H. at 495-96, 416 A.2d at 1384).

The parties to this action were competitors in the M&I ball bearing industry. By way of their unjust enrichment claim, plaintiffs seek to recover profits and revenues they allegedly lost to defendants because of defendants' purported violations of the Lanham Act, 15 U.S.C. §§ 1051-1128 (1976 & Supp. 1995), and New Hampshire's law against unfair competition, New Hampshire Revised Statutes Annotated § 358-A (1955 & Supp. 1994).

Plaintiffs contend that the availability of the equitable remedy of restitution for unjust enrichment is not limited to situations in which there is an express or implied contractual relationship between the parties in question. In support thereof, plaintiffs cite <u>Cohen</u>, <u>supra</u>, in which the New Hampshire

Supreme Court stated, "We recognize that restitution does not always contemplate an express agreement.  It may apply to contracts implied in fact or to obligations imposed by law without regard to the intention or assent of the parties, who are bound because of justice or reason."  Cohen, supra, 118 N.H. at 518, 389 A.2d at 936 (citing State v. Haley, 94 N.H. 69, 72-73, 46 A.2d 533, 535 (1946)).  Plaintiffs contend that the federal and state laws upon which their other claims are based all contain "obligations imposed by law" on defendants.  Plaintiffs further contend that defendants were unjustly enriched in the form of increased profits and revenues at plaintiffs' expense as a result of their violations of the legal obligations set forth in those federal and state laws.

Plaintiffs' argument misconstrues the law of restitution in general and the Cohen case in particular.  The "obligations imposed by law" referred to in Cohen are "quasi contracts"; that is, agreements or contracts implied at law.  See, e.g., Haley, supra, 94 N.H. at 72, 46 A.2d at 535 ("Quasi contracts are 'legal obligations arising, without reference to the assent of the obligor, from the receipt of a benefit the retention of which is unjust, and requiring the obligor to make restitution.'" (quoting WOODWARD, QUASI CONTRACTS § 3)); Presby, supra, 120 N.H. at 495, 416 A.2d at 1383 (same).  Obligations imposed on a party under

22

federal and state statutory and common law are not the type of "obligations imposed by law" that generally give rise to a claim for restitution.

Further, all claims seeking restitution rest, at bottom, on a plaintiff's ability to show that it conferred a benefit on the defendant. Here, the benefit purportedly received by defendants is increased revenues and profits, at plaintiffs' expense, as a result of defendants' alleged violations of various state and federal laws.

> While it is said that a defendant is liable [under the doctrine of unjust enrichment] if 'equity and good conscience' requires, this does not mean that a moral duty meets the demands of equity. There must be some specific legal principle or situation which equity has established or recognized, to bring a case within the scope of the doctrine.

American Univ., supra, 88 N.H. at 19-20, 183 A. at ___. Plaintiffs have not cited, nor has this court found, any New Hampshire law cases that support plaintiffs' contention that profits gained by defendants as a result of their alleged violations of the Lanham Act and New Hampshire's law against unfair competition constitute the unjust receipt and retention of a "benefit" for which restitution is required.

The court finds and rules that the circumstances of this case do not warrant a remedy under the doctrine of unjust

23

enrichment.  Instead, plaintiffs' recovery of the profits allegedly gained by defendants must come, if at all, through the claims brought by plaintiffs under the federal and state laws allegedly violated by defendants.  Defendants' motion for summary judgment is accordingly granted as to Count VI.


## C.  Substitution or Joinder of Wells Fargo Bank (document 79)

Defendants' move to dismiss or, in the alternative, for entry of an order compelling substitution or joinder of Wells Fargo Bank, N.A. (WFB), as plaintiff under Rules 17 and 21, Fed. R. Civ. P.  In support thereof, defendants contend that the named plaintiffs have completely abandoned their interest in this action to WFB and are therefore no longer the real party in interest.  Defendants' motion raises several different arguments, each of which is addressed here in turn.


### 1.  The Relationship Between WFB and This Action

On October 7, 1986, Pacamor Bearings, Inc., and Kubar Bearings, Inc., a subsidiary of Pacamor, filed for bankruptcy under Chapter 11 of the Bankruptcy Act.  Three years later, Kubar's bankruptcy proceedings were converted from Chapter 11 to Chapter 7, and William McCarthy was appointed as the Chapter 7

24

Trustee of Kubar.

On June 15, 1990, the instant action was filed in this court by Pacamor and McCarthy as trustee for the bankrupt estate of Kubar. Two years later, on June 10, 1992, Pacamor's bankruptcy proceedings were also converted to Chapter 7, and Philip J. Danaher was appointed as the Chapter 7 Trustee of Pacamor.

WFB is a secured creditor of both Pacamor and Kubar. During the course of Kubar's bankruptcy proceedings, WFB moved for an order directing McCarthy to abandon to WFB all of his right, title, and interest in this lawsuit.[9] Following a hearing on WFB's motion, the bankruptcy court indicated it would permit abandonment of the lawsuit "upon satisfaction of certain conditions to be worked out between the Bank and the Trustee . . . ." In re Kubar Bearings, Inc., Chp. 7 Case No. 86-11478, slip op. at 2 (Bankr. N.D.N.Y. Mar. 15, 1993) (Defendants' Exhibit 2). Shortly thereafter, WFB and McCarthy entered into a stipulation resolving and settling various matters and disputes between them (the Kubar Stipulation). On March 13, 1993, the bankruptcy court approved the Kubar Stipulation and adopted it in full as an order of the court. The court further

---

[9]WFB made this motion pursuant to § 554(b) of the Bankruptcy Code, which states that "[o]n request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(b) (1993).

ORDERED, that the effect of the abandonment and transfer of the Minebea Lawsuit (and the proceeds thereof) to the bank shall mean that the Bank has sole control over the management, supervision and disposition of the Minebea Lawsuit, including the decision whether or not to advance monies to fund such litigation and all decisions concerning the prosecution and settlement of the Minebea Lawsuit and any and all appeals arising therefrom and the Bank shall exercise such control in its sole and absolute discretion without seeking further approval of the Court, the Trustee or any other party;
. . . .

Id. at 3-4.

The Kubar Stipulation states in relevant part that WFB and McCarthy stipulate, consent, and agree that

The Trustee, Kubar and the Kubar estate hereby abandon to the Bank the Minebea Lawsuit and all of their right, title and interest therein, including the proceeds thereof. Notwithstanding such abandonment, the Bank shall pay to the (a) Trustee, for the benefit of the Kubar estate, free and clear of any lien or claim of the Bank, (i) five (5%) percent of the first $2,500,000 of the Net Recovery[10] . . . from the settlement,

_____

[10]The Kubar Stipulation defines "Net Recovery" as

all monies recovered by the Bank in connection with the Minebea Lawsuit which monies would have otherwise been payable to the Kubar estate, whether through judgment, settlement or otherwise less (i) all costs and expenses, including attorneys fees, incurred by the Bank in connection with the Minebea Lawsuit and (ii) all attorneys fees, expert witness fees and any other expenses arising out of or relating to the Minebea Lawsuit (including, but not limited to, the fees and expenses of the law firm of

26

judgment or any other disposition of the Minebea Lawsuit, (ii) seven and one-half (7½%) percent of the Net Recovery between $2,500,000 and $5,000,000 and (iii) seventy (70%) percent of the Net Recovery in excess of $5,000,000 and (b) United States Department of Commerce, free and clear of any lien or claim of the Bank, two and one half (2½%) percent of the first $5,000,000 of the Net Recovery.  The Bank shall have sole control over the management, supervision and disposition of the Minebea Lawsuit, including the decision whether or not to advance monies to fund such litigation and all decisions concerning the prosecution and settlement of the Minebea Lawsuit and any and all appeals arising therefrom and shall exercise such control in its sole and absolute discretion without seeking approval of the Trustee, the Bankruptcy Court or any other party.

Kubar Stipulation at 5-6.

A stipulation nearly identical in form and substance to the Kubar Stipulation was entered into between WFB and Danaher as the Chapter 7 Trustee of Pacamor (the Pacamor Stipulation) (Defendants' Exhibit 1).  The bankruptcy court approved and adopted the Pacamor Stipulation in full on April 12, 1993.


2.  Standing

Defendants maintain that this action must be dismissed because plaintiffs no longer have standing to pursue their claims.

---

O'Connell and Aronowitz)."

Kubar Stipulation at 6 (Defendants' Exhibit 2).

27

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). The doctrine of standing "involves 'a blend of constitutional requirements and prudential considerations.'" Vote Choice, Inc. v. DiStefano, 4 F.3d 26, 36 (1st Cir. 1993) (quoting Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982)). "On the constitutional side, Article III limits federal court adjudication to matters which achieve the stature of justiciable cases or controversies." Id. This generally means "that a plaintiff 'allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" County of Riverside v. McLaughlin, 500 U.S. 44, 51 (1991) (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)).

"Over and above its constitutional requisites, 'the doctrine of standing also embodies prudential concerns regarding the proper exercise of federal jurisdiction.'" Vote Choice, supra, 4 F.3d at 37 (quoting United States v. AVX Corp., 962 F.2d 108, 114 (1st Cir. 1992)). These "judicially self-imposed limits on the exercise of federal jurisdiction," include "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances

28

more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." Allen, supra, 468 U.S. at 751 (citing Valley Forge Christian College, supra, 454 U.S. at 474-75).

Defendants contend that plaintiffs, by abandoning their claims in this suit to WFB, have lost their standing. Defendants' argument rests on the prudential limitation that a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth, supra, 422 U.S. at 499 (citations omitted); see also Diamantis v. Milton Bradley Co., 772 F.2d 3, 4 (1st Cir. 1985) ("It is well settled under the standing doctrine that a party ordinarily may not assert the legal rights of others.").

There is no dispute that plaintiffs had standing to sue at the time they initiated this action. Although plaintiffs have abandoned all of their "right, title and interest" in this action to WFB, plaintiffs have retained the right to receive a percentage of the net recovery, if any, from the action. The court finds that this particular situation does not fall within the scope of the prudential limitation that a plaintiff "cannot rest his claim to relief on the legal rights or interests" of a third party, Warth, supra, 422 U.S. at 499, and therefore

29

declines to dismiss this action for lack of standing. Instead, under the circumstances outlined by the parties, the court finds that the proper inquiry is whether WFB should be substituted or added as a plaintiff under the Federal Rules of Civil Procedure.

### 3. Substitution or Joinder

Defendant next contend that this action should be dismissed because plaintiffs are no longer the real party in interest. In the alternative, defendants seek, pursuant to Rules 17 and 21, Fed. R. Civ. P., either to have WFB substituted as the plaintiff in this case or to have WFB joined as an additional plaintiff.

Rule 17 provides that "[e]very action shall be prosecuted in the name of the real party in interest." Rule 17(a), Fed. R. Civ. P. "The purpose of the rule is to prevent multiple or conflicting lawsuits by persons such as assignees, executors, or third-party beneficiaries, who would not be bound by res judicata principles." Gogolin & Stelter v. Karn's Auto Imports, Inc., 886 F.2d 100, 102 (5th Cir. 1989) (citing WRIGHT & MILLER supra, § 1541). Rule 17 applies to situations where "an interest has been transferred prior to the commencement of the suit . . . ." 7A WRIGHT & MILLER, supra, § 1958, at 553.

It is undisputed that Pacamor and McCarthy were the real parties in interest at the time this action was commenced. However, during the course of this action, plaintiffs abandoned

30

"all of their right, title and interest" in this action to WFB, except for the right to receive a percentage of any net recovery from this action. Where, as here, there has been a transfer of interest during the pendency of the action, the court must apply Rule 25(c), rather than Rule 17, to determine whether a substitution of parties should occur. See 7A WRIGHT & MILLER, supra, § 1958, at 553 ("Rule 25(c) speaks to the situation in which there is 'any transfer of interest' during the pendency of an action."); 3B JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE ¶ 25.08, at 25-57 - 25-58 (2d ed. 1995) ("Subdivision (c) of Rule 25 deals with transfers of interest during the course of the action. Rule 25(c) may be compared and contrasted with the situation where the transfer of occurs *prior* to the action, which is controlled by Rule 17(a). But where the transfer of interest takes place *during the course of the action*, Rule 25(c) controls . . . . ").

Rule 25, entitled "Substitution of Parties", states in pertinent part,

> **(c) Transfer of Interest.** In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.

"A motion under Rule 25(c) for joinder or substitution of a party after suit has been commenced is addressed to the sound discretion of the court, taking into account all the exigencies

31

of the situation." <u>FDIC v. Tisch</u>, 89 F.R.D. 446, 448 (E.D.N.Y. 1981) (citing <u>McComb v. Raw River Lumber Co.</u>, 177 F.2d 129 (9th Cir. 1949)). "Rule 25(c) is not designed to create new relationships among parties to a suit but is designed to allow the action to continue unabated when an interest in the lawsuit changes hands." <u>In the Matter of Covington Grain Co. (Collateral Control Corp. v. Deal)</u>, 638 F.2d 1362, 1364 (5th Cir. Unit B 1981).

"The most significant feature of Rule 25(c) is that it does not require that anything be done after an interest has been transferred. The action may be continued by or against the original party, and the judgment will be binding on his successor in interest even though he is not named." 7A Wright & Miller, <u>supra</u>, § 1958, at 555.

As described herein at section C.1. of this order, the named plaintiffs abandoned their interests in this action to WFB during the course of their Chapter 7 bankruptcy proceedings. The court finds that said abandonment was, in effect, an assignment of the plaintiffs' interests in this action to WFB. <u>Compare</u> 4 Collier on Bankruptcy § 554.02[2], at 554-7 (Lawrence P. King ed. 1995) ("abandonment constitutes a divesture of all interests in property that were property of the estate") <u>with</u> 6 Am. Jur. 2d *Assignments* § 1, at 185 (1963) ("A legal assignment is a transfer or setting over of property, or of some right or interests

therein, from one person to another, and unless in some way qualified, it is properly the transfer of one's whole interest in an estate, or chattel, or other thing.").

In abandoning all of their right, title, and interest in this action to WFB, Pacamor and McCarthy also gave WFB "sole control over the management, supervision, and disposition of the Minebea lawsuit . . . ." Pacamor Stipulation at 5; Kubar Stipulation at 5-6. However, the named plaintiffs retained the right to receive "free and clear of any lien or claim of the Bank" a percentage of the net recovery from this action.

In determining whether WFB should be substituted for the named plaintiffs or joined as a party under the circumstances described herein, the court finds relevant the decision of the district court in Tisch, supra, 89 F.R.D. at 446, a case in which the named plaintiff had assigned "all right, title and interest in any and all claims which have been or might be asserted against defendants in this action." Id. at 448. In consideration of this assignment, the plaintiff retained an interest in the proceeds of the action "to the extent of 10% of any recovery in excess of [the assignee's] legal expenses plus one million dollars." Id.

In response to a Rule 25(c) motion to join the assignee as a plaintiff, the Tisch court held,

> In view of the fact that although the FDIC
> has assigned its claims against defendants to

33

> the trustee it nonetheless has retained an interest in the outcome of the litigation, we find that substitution of the trustee for the FDIC is unwarranted. However in light of the assignment, and since the trustee in any event will be bound by any determination had herein, see O'Donohue v. First National Bank, 166 F. Supp. 233 (E.D. Pa. 1948), we conclude that joinder of the trustee is proper. Since both assignor and assignee are still real parties in interest, participation in this lawsuit by representatives of both is the most efficient way to insure that all issues will be fully litigated.

Id.

This court finds the rationale employed in Tisch to be persuasive and determines, for substantially the same reasons set forth therein, that joinder of WFB as a plaintiff in this action is both proper and necessary to facilitate the conduct of this litigation. In ordering that WFB be joined as a plaintiff, the court notes that this joinder "in no way affects the substantive rights of" the named plaintiffs or WFB, Tisch, supra, 89 F.R.D. at 448, nor does it "create new relationships" among the parties to this action, Covington Grain Co., supra, 638 F.2d at 1364. Instead, the joinder of WFB should, as Rule 25(c) contemplates, allow this action "to continue unabated [even though] an interest in the lawsuit [has] change[d] hands." Id.

## D. Defendants' Motion for Certification (document 97)

Defendants move pursuant to 28 U.S.C. § 1292(b) for certification of this court's decision to allow Pacamor and

34

McCarthy to continue as named plaintiffs in this action. Defendants maintain that said plaintiffs lack standing to assert the claims put forth in this action and contend that certification is required here because the issue of standing is a controlling question of law over which there is a substantial ground for difference of opinion.

Section 1292(b) states,

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order . . . .

28 U.S.C. § 1292(b) (1993) (emphasis added). Section 1292(b) "accord[s] the district courts circumscribed authority to certify for immediate appeal interlocutory orders deemed pivotal and debatable." Swint v. Chambers County Comm'n, ___ U.S. ___, ___, 115 S. Ct. 1203, 1210 (1995).

The First Circuit admonishes that

> [o]nly rare cases will qualify for the statutory anodyne; indeed, it is apodictic in this circuit that interlocutory certification of this sort "should be used sparingly and only in exceptional circumstances, and where the proposed intermediate appeal presents one or more difficult and pivotal questions of

35

law not settled by controlling authority."
In re San Juan Dupont Plaza Hotel Fire Litig., 859 F.2d 1007, 1010 n.1 (1st Cir. 1988) (quoting McGillicuddy v. Clements, 746 F.2d 76, 76 n.1 (1st Cir. 1984)).  In light of section 1292(b)'s strictures, "the instances where section 1292(b) may appropriately be utilized will, realistically, be few and far between."  Id.

Defendants' motion to dismiss or, in the alternative, for entry of an order compelling substitution or joinder of WFB, required the court to determine whether Pacamor and McCarthy continued to have standing to sue after they abandoned their interest in this action to WFB.  The court declined to dismiss this action for lack of standing, but ordered that WFB be added as plaintiff under Rule 25(c), Fed. R. Civ. P.

Standing is generally a controlling question of law in that if a plaintiff is found to lack standing, the action will be dismissed.  The doctrine of standing has been addressed at length by both the Supreme Court and the First Circuit.  Although defendants disagree with the court's application of the principles of standing to the facts of this case, the court does not find there to be a substantial ground for difference of opinion on the issue of standing in this action.

Here, the question of whether Pacamor and McCarthy have standing is not dispositive since the court has ordered that WFB

36

be added as a plaintiff.  Further, as discussed <u>supra</u> at section C.3. of this order, the addition of WFB as a plaintiff does not alter the landscape of this action.  Instead, the addition of WFB is merely a procedural matter which recognizes that Pacamor and McCarthy transferred their interest in this action to WFB.  For these reasons, the court is of the opinion that an immediate appeal of the standing issue will not materially advance the ultimate termination of this litigation.  The court therefore denies defendants' motion for certification under 28 U.S.C. § 1292(b) of issues regarding plaintiffs' standing to sue.

<u>Conclusion</u>

For the reasons set forth hereinabove, plaintiffs' motion for leave to amend (document 111) is granted in part and denied in part; defendants' motion for partial summary judgment (document 73) is granted; defendants' motion to dismiss (document 79) is granted in part and denied in part; and defendants' motion for certification (document 97) is denied.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

July 13, 1995

cc:  James L. Kruse, Esq.
     Jack McKay, Esq.
     Daniel M. Sleasman, Esq.
     Garry R. Lane, Esq.

37