Invest Almaz v. Temple-Inland          CV-97-374-JM 02/08/00

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE

**Invest Almaz**

    **v.**                                    Civil No. 97-374-JM
                                           Opinion No. 2000 DNH 037

**Temple-Inland Forest**
**Products Corporation**


### MEMORANDUM AND ORDER

This case arises out of the unsuccessful attempt by

Plaintiff Invest Almaz, a Russian corporation, to purchase the

equipment housed in a manufacturing plant located in Claremont,

New Hampshire.  Invest Almaz acted through Pathex International

Ltd., its partner in a joint venture formed to acquire

manufacturing equipment that could be transported to Russia.

Pathex entered into an agreement to purchase the equipment from

the owner of the Claremont plant, Defendant Temple-Inland Forest

Products Corporation, a large corporation based in Texas.  In

exchange for the equipment, Pathex promised to pay Temple-Inland

two million dollars in cash and to give Temple-Inland a secured

promissory note for three million dollars.

Although Invest Almaz advanced over six million dollars to

Pathex for the purpose of purchasing the equipment, Pathex failed to make any payments on the promissory note it gave to Temple-Inland. After Pathex defaulted on the note, Pathex and Temple-Inland forged a settlement in which Temple-Inland canceled Pathex's indebtedness under the note and regained title to the equipment. Temple-Inland also retained approximately $2.3 million in cash that it had received from Pathex over the course of the transaction.

Invest Almaz then brought the present suit against Temple-Inland, alleging that Temple-Inland is liable for: (1) aiding and abetting Pathex in breaching a fiduciary duty owed to Invest Almaz; (2) fraudulently concealing material terms of the asset purchase agreement and subsequent settlement agreement; and (3) unjustly enriching itself at Invest Almaz's expense. The first two of these claims were tried to a jury. At the end of Invest Almaz's case, this court granted judgment as a matter of law in favor of Temple-Inland on the fraudulent concealment claim. At the conclusion of the trial, the jury returned a verdict in favor of Temple-Inland on the aiding and abetting claim.

In this order, I rule upon Invest Almaz's unjust enrichment claim, which as an equitable claim for restitution was tried to the court.[1] For the reasons that follow, I conclude that Temple-Inland was not unjustly enriched by the funds it received from Pathex and therefore that Invest Almaz is not entitled to restitution from Temple-Inland.

## I. BACKGROUND[2]

Invest Almaz is a subsidiary of Almazy Rossii-Sakha, a Russian company engaged in diamond mining. The mining company created Invest Almaz to invest the pension and savings funds of its miners and other employees. In early 1993, Invest Almaz began to explore the possibility of investing in the production of oriented strand board ("OSB"), a wood and wafer resin board

---

[1] In a previous order, I denied Temple-Inland's request to allow the jury to decide the unjust enrichment claim. See Invest Almaz v. Temple-Inland Forest Prods. Corp., Civil No. C-97-374-JM, 2000 WL 36938 (D.N.H. November 22, 1999).

[2] In this section, I set forth the background facts of the case. The contested issues of fact most relevant to Invest Almaz's claim for restitution are discussed in the following section of the order.

used as a construction material.  Invest Almaz hoped to acquire a plant to manufacture OSB, which it could use both to build housing for its retired employees and to export in exchange for hard currency.

On October 4, 1993, Invest Almaz entered into a joint venture agreement with Pathex, a Canadian corporation that claimed to have expertise in OSB production.  The purpose of the venture was to acquire a North American OSB manufacturing plant that could be disassembled, transported to Russia, rebuilt, and put into operation.  Under the joint venture agreement, Pathex assumed responsibility for locating a suitable plant, negotiating the purchase of the plant's assets, and relocating the plant to Russia.  Invest Almaz's primary role was to supply the cash used to purchase, remove and partially renovate the plant.  Pathex informed Invest Almaz that the total cost of acquiring such a plant would be over 17 million dollars.

In late 1992 or early 1993, before it joined forces with Invest Almaz, Pathex had already set about negotiating with Temple-Inland for the sale of some or all of the assets of

4

Temple-Inland's OSB plant in Claremont, New Hampshire. On August 5, 1993, Temple-Inland and a Pathex subsidiary[3] entered into an agreement that granted Pathex an option to purchase the plant's assets for five million dollars. The agreement provided for an initial option price of $150,000, with the right to extend for four additional months at a cost of $100,000 per month. The option payments were to be credited against the purchase price, but were otherwise nonrefundable. Because it paid an additional $150,000 to extend the option beyond the period originally contemplated by the agreement, Pathex ultimately paid a total of $700,000 to Temple-Inland to keep the option in effect.

In 1994, Pathex exercised its option on the Claremont plant and entered into an asset purchase agreement with Temple-Inland. The agreement provided that two million dollars of the purchase price would be paid at or before closing, with the remaining three million dollars to be paid in the form of a promissory

---

[3] The Pathex subsidiary was known as "1040028 Ontario, Inc." or "Newco." For simplicity's sake, I follow the parties' practice by referring to all Pathex entities as "Pathex," except when the specific identity of the entity is relevant to my legal analysis.

note. Temple-Inland would also receive a security interest in the plant equipment, which were the only assets that Pathex ultimately purchased. Pathex and Temple-Inland closed the sale on March 31, 1994.

In the summer of 1994, Pathex failed to make the first payment due under the note. Although Pathex and Temple-Inland negotiated a series of extensions, Pathex ultimately defaulted without making any payments on the note. Pathex and Temple-Inland then devised a settlement agreement in which Temple-Inland released Pathex from its indebtedness under the note in exchange for a reconveyance of the secured assets back to Temple-Inland. In addition to reacquiring title to the plant equipment, Temple-Inland retained approximately $2.3 million in cash that it had received from Pathex during the course of the transaction.

## II.  DISCUSSION

Invest Almaz claims that it is entitled to restitution from Temple-Inland for approximately $2.3 million that Temple-Inland received from Pathex and that Pathex, in turn, received from Invest Almaz. The crux of Invest Almaz's claim for restitution

is that Temple-Inland unjustly enriched itself at Invest Almaz's expense as a result of a settlement agreement that left Temple-Inland in possession of both the plant equipment and the funds paid to Temple-Inland as part of the purchase price for that equipment. Invest Almaz alleges that because it was the original source of the funds paid to Temple-Inland, it conferred a benefit on Temple-Inland and is entitled to restitution. See Pl.'s Second Am. Compl. (Doc. #31) ¶¶ 52-54.[4]

In a submission filed after the close of trial, Invest Almaz advanced two legal theories in support of its claim for restitution. First, Invest Almaz asserted that it is entitled to restitution under general equitable principles as expressed in New Hampshire common law. See Pl.'s Proposed Findings of Fact & Conclusions of Law (Doc. #98) at 5-6 and attached Mem. in Supp. at 5-6. Second, Invest Almaz introduced for the first time in this litigation a theory of recovery based on §201(1) of the

_____

[4] While Invest Almaz's amended complaint provides $2,180,000 as the amount paid to Temple-Inland, at trial Invest Almaz argued and offered evidence in support of the $2.3 million figure. See infra section II.A.

7

Restatement of Restitution.  <u>See</u> Pl.'s Proposed Findings of Fact

& Conclusions of Law (Doc. #98) at 6-9 and attached Mem. in Supp.

at 7-14.  I consider each of these theories in turn.

**A.    New Hampshire Common Law of Restitution and Unjust Enrichment**

New Hampshire has a well-established body of common law

dealing with restitution and unjust enrichment.  The principles

set forth in these cases provide the most appropriate basis for

deciding Invest Almaz's claim for equitable relief.

Under New Hampshire law, restitution is an equitable remedy

that a court may use to prevent unjust enrichment.  "A trial

court may require [a defendant] to make restitution for unjust

enrichment if [the defendant] has received a benefit which would

be unconscionable for him to retain." <u>R. Zoppo Co., Inc. v. City

of Manchester</u>, 122 N.H. 1109, 1113 (1982) (citing <u>Petrie-Clemons

v. Butterfield</u>, 122 N.H. 120, 127 (1982)).  The doctrine of

unjust enrichment provides that "one shall not be allowed to

profit or enrich himself at the expense of another contrary to

equity." <u>Pacamor Bearings, Inc. v. Minebea Co., Ltd.</u>, 892 F.

Supp. 347, 356 (D.N.H. 1995) (quoting <u>Cohen v. Frank Developers,</u>

<u>Inc.</u>, 118 N.H. 512, 518 (1978)) (internal quotation marks omitted).

The absence of an express contractual agreement between Invest Almaz and Temple-Inland is not fatal to Invest Almaz's restitution claim. Because restitution is an equitable remedy based on quasi-contract, i.e., an obligation implied in law, the existence of an express contract is not determinative under New Hampshire law. See <u>Pacamor Bearings</u>, 892 F. Supp. at 356; <u>Pella Windows and Doors, Inc. v. Faraci</u>, 133 N.H. 585, 586 (1990); <u>R. Zoppo</u>, 122 N.H. at 1113. As the Supreme Court of New Hampshire has explained, a quasi-contract or implied-in-law contract is "a legal remedy imposed by a court 'without reference to the assent of the obligor, . . . arising . . . from the receipt of a benefit the retention of which is unjust, and requiring the obligor to make restitution.'" <u>Morgenroth & Assocs., Inc. v. Town of Tilton</u>, 121 N.H. 511, 514 (1981) (quoting <u>Presby v. Bethlehem Village Dist.</u>, 120 N.H. 493, 495 (1980) (quoting <u>State v. Haley</u>, 94 N.H. 69, 72 (1946))).

Furthermore, Invest Almaz is not required to demonstrate

that Temple-Inland acted wrongfully in retaining the funds it received from Pathex. Rather, Invest Almaz is entitled to restitution if it can show that Temple-Inland was unjustly enriched, "either through wrongful acts or [through] passive acceptance of a benefit that would be unconscionable to permit [Temple-Inland] to retain." R. Zoppo Co., 122 N.H. at 1113 (citing Cohen, 118 N.H. at 518); see also Curtis Mfg. Co., Inc. v. Plasti-Clip Corp., 933 F. Supp. 94, 104 (D.N.H. 1995); Petrie-Clemons, 122 N.H. at 127.

To determine "whether the facts and equities of [this] particular case warrant a remedy in restitution," Petrie-Clemons, 122 N.H. at 127, I must decide whether Temple-Inland has been unjustly enriched. The answer to that question depends on whether it would be unconscionable for Temple-Inland to retain both the equipment and the funds it received from Pathex. If I conclude that Temple-Inland was unjustly enriched at Invest Almaz's expense, then I must determine the amount of money that Invest Almaz is entitled to receive in restitution. Under New Hampshire law, "when a court assesses damages in an unjust

10

enrichment case, the focus is not upon the cost to the plaintiff, but rather it is upon the value of what was actually received by the defendant[]." Iacomini v. Liberty Mut. Ins. Co., 127 N.H. 73, 78 (1985) (quoting R. Zoppo, 122 N.H. at 1113) (internal quotation marks omitted); see also Petrie-Clemons, 122 N.H. at 127.

To apply these principles to Invest Almaz's claim for restitution, I first must determine whether Invest Almaz conferred a benefit on Temple-Inland. The answer to this preliminary question is yes. The evidence presented at trial establishes that over the course of the transaction, Pathex paid a total of approximately $2.3 million to Temple-Inland. See Pl.'s Ex. 22 at TI-000831; Sweeny Testimony, Trial Transcript, Day 1, Afternoon Session (Doc. #77) at 77, 79; Cooke Testimony, Trial Transcript, Day 3, Morning Session (Doc. #81) at 16-17; Vorpahl Testimony, Trial Transcript, Day 4, Morning Session (Doc. #85) at 57-58, 60-61. The evidence further demonstrates that Invest Almaz was the original source of those funds. See Vorpahl Testimony, Trial Transcript, Day 4, Morning Session (Doc. #85) at

11

58, 59, 61; Dep. of Charles A. Kosa at 206-07. Accordingly, I conclude that Invest Almaz, acting through its coventurer Pathex, conferred a benefit on Temple-Inland.

The next question that I must answer is whether it would be unconscionable for Temple-Inland to retain the benefit it received. I conclude for the following reasons that it is not unconscionable for Temple-Inland to retain the funds in question: (1) Temple-Inland gave value in return for the funds; (2) Temple-Inland incurred substantial expenses attributable to the sale of the equipment to Pathex; (3) Temple-Inland received the bulk of the funds in good faith as partial payment for the equipment; and (4) Invest Almaz failed to produce at trial any evidence that the settlement agreement between Temple-Inland and Pathex was unreasonable or unconscionable. I explain each of these reasons in turn.

### 1. Temple-Inland Gave Value

Temple-Inland gave value in exchange for the funds it received from Pathex. First, $700,000 of the $2.3 million that Pathex paid to Temple-Inland represented payments made in

consideration of (and subsequently to extend) the August 5, 1993 option agreement. See Pl.'s Ex. 7; Pl.'s Ex. 22 at TI-000831; Sweeny Testimony, Trial Transcript, Day 1, Afternoon Session (Doc. #77) at 72; Vorpahl Testimony, Trial Transcript, Day 4, Afternoon Session (Doc. #86) at 26. In return for these payments, Temple-Inland granted Pathex an exclusive option to purchase the plant buildings, land, and equipment. See Pl.'s Ex. 7. Because Pathex (and by extension its coventurer Invest Almaz) reaped the full benefit of the option agreement, Invest Almaz is not entitled to recover the option payments.

Second, after Pathex failed to make timely payments on the promissory note, it paid Temple-Inland a total of $300,000 in delinquency charges. See Pl.'s Ex. 22 at TI-000831 (showing payment of $120,000 received in August 1994 and payment of $180,000 received in September 1994); Def.'s Ex. HH at 000073-000078; Vorpahl Testimony, Trial Transcript, Day 4, Afternoon Session (Doc. #86) at 38-39. These payments, which were not attributable to the outstanding debt, were made solely in consideration of Temple-Inland's agreement to grant Pathex

13

additional time to meet its obligations under the note. See Pl.'s Ex. 42; Def.'s Ex. HH at 000073; Vorpahl Testimony, Trial Transcript, Day 4, Afternoon Session (Doc. #86) at 38-39. Because Pathex (and thus Invest Almaz) received the benefit of these payments, Invest Almaz is not entitled to a return of these funds.

Taken together, the option payments and the delinquency payments amount to one million dollars for which Temple-Inland gave full value. Because Temple-Inland was justly entitled to that amount, Invest Almaz cannot recover those funds in equity.

### 2. Temple-Inland Incurred Expenses Attributable to the Transaction

Temple-Inland claims that it incurred expenses attributable to the sale of the equipment that must be offset against any benefit that it received from Invest Almaz. Specifically, Temple-Inland claims three types of expenses: carrying costs, environmental costs, and the cost of a payment that it made to General Electric Company. See Def.'s Reqs. for Findings of Fact and Rulings of Law (Doc. #97) at 5-7. For the reasons that follow, I find that only the payment to General Electric is an

14

expense chargeable to the transaction.

I reject Temple-Inland's contention that it incurred carrying costs related to the Claremont plant that should be offset against the $2.3 million it received from Pathex. Temple-Inland has already been compensated, by means of the option payments, for any carrying costs it incurred during the option period. Moreover, Temple-Inland cannot have incurred carrying costs associated with the plant equipment from the date of the closing to the date that Temple-Inland regained title to the equipment as a result of the post-default settlement, because Pathex owned the equipment during that period. Furthermore, because Pathex ultimately elected to take title only to the plant equipment and not to the land and buildings, see Pl.'s Ex. 17, any of Temple-Inland's expenses associated with the land and buildings are not attributable to the transaction. Finally, Temple-Inland cannot be credited with any carrying costs incurred after it regained title to the equipment, because at that point the transaction had been completed and Temple-Inland was free to

sell the assets to another purchaser.[5]  Accordingly, I find that Temple-Inland did not have any carrying costs associated with the plant equipment that can fairly be charged against the $2.3 million it received from Pathex.

I also reject Temple-Inland's attempt to offset against the funds it received from Pathex the cost of evaluating and ameliorating environmental conditions at the plant site.  The cost of cleaning up the site is not attributable to the transaction, because Temple-Inland had an independent legal duty to conform with environmental standards.  Although the cleanup may have occurred when it did due to the impending sale to Pathex, Temple-Inland was nonetheless obligated to perform the cleanup even in the absence of the sale.  Accordingly, Temple-Inland cannot charge the cost of the cleanup against the funds that it received from Pathex.

Unlike the carrying and environmental costs, however, the

---

[5]  In fact, evidence at trial showed that Temple-Inland did find another company willing to purchase the equipment, although that sale ultimately fell through.  See Pl.'s Ex. 63; McClain Testimony, Trail Transcript, Day 7 (Doc. #94) at 95-97.

16

payment that Temple-Inland made to General Electric is an expense incurred as a direct result of the sale of the equipment to Pathex.  In November 1981, the Elmendorf Board Corporation, the company that owned the Claremont plant before it was purchased by Temple-Inland, entered into a "tax benefit transfer agreement" or capital lease agreement with General Electric.  See Def.'s Ex. MM; Def.'s Ex. NN; Vorpahl Testimony, Trial Transcript, Day 4, Afternoon Session (Doc. #86) at 34-36.  This agreement gave General Electric certain tax benefits, provided that the equipment remained in use at the plant during the fifteen-year period of the lease.  See id.  After Elmendorf went bankrupt, Temple-Inland purchased the plant subject to the provisions of the lease agreement with General Electric.  See Def.'s Ex. NN. When Temple-Inland sold the equipment to Pathex, General Electric incurred a tax liability in the amount of $320,000 because Pathex intended to remove the equipment from the plant before the fifteen-year lease period had expired.  See Vorpahl Testimony, Trial Transcript, Day 4, Afternoon Session (Doc. #86) at 34-36. Because Temple-Inland had acquired the equipment subject to the

17

lease agreement, it was obligated to compensate General Electric for this liability.  See id.; Def.'s Ex. NN; Pl.'s Ex. 22 at TI-000828, TI-000831.  I conclude that the cost of the $320,000 payment to General Electric is attributable to the transaction, because Temple-Inland would not have been required to make the payment if the equipment had been sold at a later date or to a purchaser that did not intend to remove it from the plant.

I find that Temple-Inland incurred $320,000 in expenses as a result of the sale of the equipment to Pathex.  I further find that Pathex received full value for $700,000 in option payments and $300,000 in delinquency payments that it made to Temple-Inland.  Accordingly, I conclude that 1.32 million dollars of the funds that Temple-Inland received from Pathex are accounted for by value given and costs associated with the transaction.  This amount must be deducted from any potential award of restitution, because Temple-Inland was justly entitled to these funds.  This calculation leaves $980,000 as the maximum potential amount of the benefit conferred upon Temple-Inland by Invest Almaz. Therefore, I must determine whether it would be unconscionable to

18

allow Temple-Inland to retain the remaining $980,000. As set forth below, I conclude that it is not unconscionable for Temple-Inland to retain those funds.

### 3. Temple-Inland Received the Funds as Partial Payment for the Equipment

Temple-Inland received two million dollars of the $2.3 million paid to it by Pathex as partial payment toward the five million dollar purchase price of the equipment.[6] After receiving the cash down payment, Temple-Inland transferred title to the equipment to Pathex, subject to the promissory note and security agreement. Because Temple-Inland received the two million dollars in good faith as part of the total amount that Pathex owed it under the asset purchase agreement, it was not unjustly

---

[6] I have found that of the $2.3 million dollars paid by Pathex to Temple-Inland, $300,000 consisted of delinquency payments that were not to be credited against the purchase price. See supra section II.A.1. The remaining two million dollars in cash, which comprised the down payment, consisted of the $700,000 in option payments, see id., and $1.3 million in cash that Pathex paid to Temple-Inland at the time of closing. See Pl.'s Ex. 22 at TI-000831; Pl.'s Ex. 16 at TI-000266; Sweeny Testimony, Trial Transcript, Day 1, Afternoon Session (Doc. #77) at 72. The $980,000 "benefit" conferred upon Temple-Inland comprises part of the two million dollar down payment.

enriched by those funds.  Cf. Indus. Indemnity Co. v. Truax Truck Line, Inc., 45 F.3d 986, 990 (5th Cir. 1995) ("The Restatement of Restitution . . . provides, if payment is made, even by mistake, to a creditor of a third person to satisfy a just debt of that third person, the payor has no right of restitution of or from the third party.") (quoting Omnibank of Mantee v. United Southern Bank, 607 So.2d 76, 92 (Miss. 1992) (citing Restatement of Restitution § 14(1) (1937))); United States v. Bedford Assocs., 713 F.2d 895, 904 (2d Cir. 1983) ("It is well established that the court has discretion to deny a plaintiff restitution of an unrequired payment to a defendant, where the defendant has received the payment in good faith and used it in satisfaction of the debt of a third person to the defendant."); Equilease Corp. v. Hentz, 634 F.2d 850, 853 (5th Cir. 1981) ("It is patently unfair to require an innocent payee who has received and used the money to satisfy a debt to repay the money.").  In other words, because Temple-Inland "had a sufficient legal . . . claim" to the funds it received as down payment on the equipment, "equity will not compel restitution" of those funds.  Equilease, 634 F.2d at

20

854.

### 4. Invest Almaz Produced No Evidence that the Post-Default Settlement was Inequitable

Under the terms of the post-default settlement agreement between Temple-Inland and Pathex, Temple-Inland regained title to the plant equipment (i.e., the collateral under the security agreement), in return for which it canceled the three million dollar debt that Pathex owed under the promissory note and released Pathex from any attendant liability related to the asset purchase transaction.  See Pl.'s Ex. 60; Sweeny Testimony, Trial Transcript, Day 1, Afternoon Session (Doc. #77) at 78-79; Vorpahl Testimony, Trial Transcript, Day 4, Morning Session (Doc. #85) at 60-61.  I would find the settlement agreement to be unconscionable if Invest Almaz had established that sale of the collateral at public auction would have yielded an amount greater than the amount of the secured debt plus the cost of the sale. Any such surplus would have been recoverable by the debtor, Pathex, see N.H. Rev. Stat. Ann. § 382-A:9-504(2) (1994), and perhaps ultimately by Invest Almaz.  Temple-Inland would have been unjustly enriched if it had deprived Pathex or Invest Almaz

of such a surplus.  At trial, however, Invest Almaz failed to present any evidence that the equipment could have been sold at auction for an amount greater than the outstanding three million dollar debt owed by Pathex.  In the absence of any such evidence, it is neither unreasonable nor unconscionable to allow Temple-Inland to retain both the collateral and the funds paid by Pathex as down payment on the purchase price.

In short, I conclude that Temple-Inland was not unjustly enriched by the $2.3 million that it received from Pathex, because: (1) Temple-Inland received one million dollars as compensation for the option agreement and for agreeing to grant Pathex additional time to make payments on the promissory note; (2) Temple-Inland was obligated to pay $320,000 to General Electric as a direct consequence of the transaction; (3) Temple-Inland received two million dollars in good faith as partial payment toward the purchase price of the equipment; and (4) in the absence of any evidence that the equipment could have been sold at auction for more that the amount of Pathex's outstanding debt, the post-default settlement agreement between Temple-Inland

22

and Pathex was not unconscionable.  Because Temple-Inland was entitled to regain title to the equipment and retain the funds it received from Pathex, Invest Almaz is not entitled to restitution under New Hampshire common law.

B.    Restatement of Restitution § 201(1)

I now turn to Invest Almaz's second theory of recovery, which is based on § 201(1) of the Restatement of Restitution.  As explained below, I reject Invest Almaz's argument under the Restatement both because it is not clear that the New Hampshire Supreme Court would recognize the argument and because the argument fails on its merits.

Invest Almaz has not cited, and independent research has not revealed, any decision in which the New Hampshire Supreme Court (or any federal court deciding under New Hampshire law) has recognized a claim for restitution under § 201(1).[7]  I am

---

[7]  Courts applying the laws of other jurisdictions have given credence to the theory of restitution set forth in Restatement § 201(1).  See, e.g., Higgins v. Shenango Pottery Co., 279 F.2d 46, 53-4 (3d Cir. 1960) (Pennsylvania law); Higgins v. Shenango Pottery Co., 256 F.2d 504, 510 (3d Cir. 1958) (same); Lawyers Title Ins. Corp. v. United Am. Bank of Memphis, 21 F. Supp.2d 785, 806-07 (W.D. Tenn. 1998) (Tennessee law); Terrydale

reluctant to predict that the New Hampshire Supreme Court would adopt this theory of recovery in the present case, especially when it could decide the case based on the body of New Hampshire case law on restitution described and applied above. The First Circuit has warned that "litigants who reject a state forum to bring suits in federal court under diversity cannot expect that new trails will be blazed." Ryan v. Royal Insurance Co. of America, 916 F.2d 731, 744 (1st Cir. 1990).[8]

_____

Liquidating Trust v. Barness, 611 F. Supp. 1006, 1031-32 (S.D.N.Y. 1984) (Missouri law); B.J. McAdams, Inc. v. Boggs, 439 F. Supp. 738, 752 (E.D. Pa. 1977) (Pennsylvania law); Brown v. New York Life Ins. Co., 58 F. Supp. 252, 257, 260 n.15 (D. Or. 1944), aff'd, 152 F.2d 246 (9th Cir. 1945); Midstate Amusement Corp. v. Rivers, 54 F. Supp. 738, 739 (E.D. Wash. 1944); Demoulas v. Demoulas, 703 N.E.2d 1149, 1169 (Mass. 1998); Namow Corp. v. Egger, 668 P.2d 265, 267 (Nev. 1983); Regal Ins. Co. v. Summit Guar. Corp., 324 N.W.2d 697, 705 (Iowa 1982).

[8] Invest Almaz's equitable claim is unlike its claim for aiding and abetting a breach of fiduciary duty, which depended upon the adoption of a cause of action from the Restatement (Second) of Torts that had not previously been recognized by the New Hampshire Supreme Court. In the case of the tort claim, New Hampshire did not already have a well-established body of law that applied to the claim, and thus it was reasonable to conclude that the New Hampshire Supreme Court would, if squarely presented with the issue, adopt the Restatement position. See Invest Almaz v. Temple-Inland Forest Prods. Corp., Civil No. 97-CV-374-B, slip op. at 9-10 n.4 (D.N.H. August 18, 1998). The claim for

24

Moreover, even when applied, Invest Almaz's theory of recovery under § 201(1) of the Restatement of Restitution fails on its merits. Section 201(1) provides that "[w]here a fiduciary in violation of his duty to the beneficiary transfers property or causes property to be transferred to a third person, the third person, if he gave no value or if he had notice of the violation of duty, holds the property upon a constructive trust for the beneficiary." Restatement of Restitution § 201(1) (1937). Assuming for purposes of analysis that Pathex owed a fiduciary duty to Invest Almaz and that Pathex breached that duty by transferring $2.3 million to Temple-Inland,[9] Invest Almaz is

_____

restitution, by contrast, directly implicates an existing body of New Hampshire case law.

[9] Recovery under § 201(1) requires that Pathex's transfer of the $2.3 million to Temple-Inland itself constitute a breach of fiduciary duty. Although I have assumed for purposes of analysis that this requirement is satisfied, I note that Invest Almaz has not shown (or even clearly argued) that the transfer of funds itself breached Pathex's duty. Rather, Invest Almaz seems to argue that Pathex's breach stemmed from its decision to take title to the equipment in the name of a Pathex subsidiary, combined with its intention to resell the equipment to Invest Almaz at a profit. See Pl.'s Mem. in Supp. of Proposed Findings of Fact & Conclusions of Law (Doc. #98) at 13.

25

entitled to restitution under § 201(1) if it can prove either of the following: that Temple-Inland gave no value for the funds it received or that Temple-Inland had notice of Pathex's breach of duty.  Invest Almaz argues that it is entitled to restitution under either of these prongs.  I disagree.

The evidence introduced at trial demonstrates that Temple-Inland gave value for the funds it received from Pathex.  As discussed above, Temple-Inland gave value by: (1) providing Pathex with an exclusive option to purchase the plant, in accordance with the option agreement; (2) granting Pathex additional time to make payments on the promissory note, in return for the delinquency payments; and (3) transferring title to the equipment to Pathex, subject to a three million dollar promissory note and a security agreement.  Because Temple-Inland gave value for the funds it received from Pathex, Invest Almaz is not entitled to restitution under the first prong of § 201(1).

The second prong of § 201(1) focuses on whether Temple-Inland had notice of Pathex's breach of duty.  Invest Almaz contends that the Restatement of Restitution requires only

constructive notice of breach.  In support of this contention, Invest Almaz cites § 174 of the Restatement, which provides in relevant part that "a person has notice of facts giving rise to a constructive trust if he knows the facts or should know them." Restatement of Restitution § 174.  Invest Almaz maintains that Temple-Inland had constructive notice that Pathex was breaching a fiduciary duty owed to Invest Almaz because "Temple-Inland knew that although Pathex was not the real party in interest putting up the money to purchase the plant (a) Pathex sought to transfer title to the plant not to Invest Almaz but to a Pathex subsidiary and (b) Pathex sought to resell the plant to the Russian company [e.g., Invest Almaz] at a profit."  Pl.'s Mem. in Supp. of Proposed Findings of Fact & Conclusions of Law (Doc. #98) at 13 (alteration added).

I find, however, that the evidence adduced at trial does not establish that Temple-Inland had even constructive notice of any breach of duty by Pathex.  First, there is no evidence to support the proposition that Pathex's decision to take title to the equipment in the name of a subsidiary gave or should have given

27

Temple-Inland any reason to suspect that Pathex was breaching a fiduciary duty. George Vorpahl, general counsel and vice president of Temple-Inland, see Vorpahl Testimony, Trial Transcript, Day 3, Afternoon Session (Doc. #82) at 34, offered credible testimony that he considered Pathex's decision to enter the option agreement through a subsidiary to be an unremarkable feature of the transaction. See Vorpahl Testimony, Trial Transcript, Day 4, Afternoon Session (Doc. #86) at 20; Vorpahl Testimony, Trial Transcript, Day 3, Afternoon Session (Doc. #82) at 60. I find that Vorpahl's testimony supports an inference that Temple-Inland officials similarly viewed Pathex's use of a subsidiary to effectuate the asset purchase transaction as an ordinary business practice.

Nor is there is any evidence that Temple-Inland knew or should have known that Pathex was planning to breach a fiduciary duty by reselling the equipment to its Russian coventurer at a profit. Notwithstanding Invest Almaz's suggestion to the contrary, Vorpahl's speculative statement that he "assumed" that Pathex would resell the plant assets for a higher price than it

28

had paid for them, <u>see</u> Vorpahl Testimony, Trial Transcript, Day 3, Afternoon Session (Doc. #82) at 44-45, does not establish that Temple-Inland had constructive notice of a breach of duty by Pathex.

Accordingly, I determine that Invest Almaz is not entitled to restitution under Restatement § 201(1) because even assuming that Pathex's payment of $2.3 million to Temple-Inland was a breach of fiduciary duty, Temple-Inland gave value and lacked notice of the breach. <u>See</u> Restatement of Restitution § 172(1) ("Where a person acquires title to property under such circumstances that otherwise he would hold it upon a constructive trust or subject to an equitable lien, he does not so hold it if he gives value for the property without notice of such circumstances.").

## III. <u>CONCLUSION</u>

For the above-stated reasons, I conclude that Invest Almaz is not entitled to restitution from Temple-Inland for any part of the $2.3 million that Invest Almaz paid to Pathex and that Pathex, in turn, paid to Temple-Inland.

29

**SO ORDERED.**


                                       _____
James R. Muirhead
United States Magistrate Judge


February 8, 2000

cc:  Michael C. Harvell, Esq.
     Mark H. Alcott, Esq.
     Russell F. Hilliard, Esq.